## COURT OF APPEALS,

### Sept. 29, 1908.

# THE PEOPLE v. OTIS HINKSMAN.

(192 N. Y. Rep. 421.)

(1.) MURDER—SUFFICIENCY OF EVIDENCE TO WARRANT CONVICTION FOR MURDER—WHEN ERRORS ON TRIAL CANNOT BE OVERLOOKED ON APPEAL.

The evidence on the trial of a defendant indicted for murder in the first ·degree examined and *held*, although not strong, yet sufficient to sustain a verdict of conviction in the absence of material and substantial errors on the trial. The presence of such errors, however, cannot be overlooked where the chain of evidence, although technicialy unbroken, is so weak as to yield to the attack of very slight opposing facts or circumstances.

(2.) SAME — EVIDENCE — GENERAL CHARACTER OF DEFENDANT WHO TESTIFIES IN HIS OWN BEHALF ON CRIMINAL TRIAL IS SAFE FROM ATTACK UNTIL HE, HIMSELF, INTRODUCES EVIDENCE RELATING TO IT.

The general character of a defendant in a criminal trial, who offers himself as a witness in his own behalf, is safe from attack until he puts it in issue by himself introducing evidence relating to it. When he assumes the character of a witness he exposes himself to the legitimate attacks which may be made upon any witness. Other witnesses may be called to impeach his credibility by showing that his general reputation for veracity is bad, or he may upon cross-examination be interrogated as to any specific act or thing which may affect his character and tend to show that he is not worthy of belief. But evidence of general bad character, which is nothing but evidence of general reputation, is not competent to decide the issue whether a defendant who testifies in his own behalf is worthy of belief, any more than evidence of a reputation for untruthfulness is directly decisive of his guilt or innocence, and, hence, the prosecution cannot give evidence of the bad character of the accused unless the accused has first adduced evidence of good character as tending to support the presumption of innocence.

(3.)    SAME—ERRONEOUS INTRODUCTION BY PROSECUTION OF EVIDENCE
    AS TO DEFENDANT'S GENERAL CHARACTER—WHEN SUFFICIENT
    TO WARRANT REVERSAL OF JUDGMENT OF CONVICTION.

Where, therefore, on the trial of an indictment for murder, the
defendant is called as a witness in his own behalf, and after stat-
ing in some detail the history of his life and specifically denying
the more serious of the circumstances calculated to connect him
with the murder, testifies that the only trouble he had ever been
in was a conviction for grand larceny three years before, that
sentence had been suspended and that he had been a good boy
ever since, the door is not opened for the introduction, by the prose-
cution, of evidence as to the defendant's general reputation, and the
admission of testimony to the effect that his reputation is bad
constitutes error, which, where the opposing facts are very evenly
balanced, or the direct case against him is weak, is sufficient to
warrant the reversal of a judgment of conviction.

(4.)    TRIAL—SUMMING UP BY DISTRICT ATTORNEY ON TRIAL FOR MUR-
    DER—UNAUTHORIZED AND PREJUDICIAL REMARKS.

Statements made by the district attorney in summing up on the
trial of an indictment for murder, in which he referred to evidence
erroneously introduced as to defendant's bad character and to the
defendant's failure to produce evidence as to his good character,
examined and *held*, to have been unauthorized and extremely
prejudicial.

APPEAL from a judgment of the Supreme Court, rendered
June 28, 1906, at a trial term in and for the county of Suffolk,
upon a verdict convicting the defendant of the crime of murder in
the first degree.

The facts, so far as material, are stated in the opinion.

*Martin F. Manton,* for appellant. The verdict was against
the weight of evidence and justice requires that a new trial be
granted. (*People* v. *Place,* 157 N. Y. 594; *People* v. *Harris,*
136 N. Y. 453.) The court committed reversible error in al-
lowing evidence offered by the People of a general bad reputa-
ton of the defendant when he himself had not first placed in
issue the question of his character by offering evidence of good

character. (Abbott's Tr. Brief, § 89; *People* v. *Casey,* 72 N. Y. 298; *McDonald* v. *Comm.,* 86 Ky. 10; *People* v. *Pekarz,* 185 N. Y. 483; *People* v. *Bonier,* 179 N. Y. 315; *People* v. *Greenwald,* 108 N. Y. 302; *Brandon* v. *People,* 42 N. Y. 267.) The district attorney committed grave and prejudicial error in his summing up by making statements unwarranted by the evidence, which statements were sanctioned by the trial court. (*People* v. *Greenwald,* 115 N. Y. 520; *People* v. *Fielding,* 158 N. Y. 542; *People* v. *Smith,* 55 App. Div. 368; *People* v. *Brooks,* 131 N. Y. 321; *People* v. *Mitchel,* 62 Cal. 411; *Greene* v. *State,* 17 Tex. App. 395; *Ferguson* v. *State,* 49 Ind. 33.)

*George H. Furman, District Attorney,* for respondent. The evidence taken on the trial pointed irresistibly and conclusively to the guilt of the defendant. (*People* v. *Place,* 157 N. Y. 584; *People* v. *Harris,* 136 N. Y. 423.) Evidence of bad reputation is always admissible against a defendant after he has taken the stand for the purpose of affecting his credibility. Such evidence is not dependent on the defendant having first introduced evidence of his good character. (*Burdick* v. *People,* 58 Barb. 51; *Adams* v. *People,* 9 Hun, 89; *People* v. *Fitzgerald,* 156 N. Y. 260; *People* v. *Giblin,* 114 App. Div. 600; *People* v. *Webster,* 139 N. Y. 74; *Brand* v. *People,* 42 N. Y. 265; *People* v. *Giblin,* 113 N. Y. 196; *People* v. *McCormick,* 135 N. Y. 663; *People* v. *Webster,* 139 N. Y. 83; *People* v. *Casey,* 72 N. Y. 398.) No error was committed by the district attorney in his summing up. (*People* v. *Wolf,* 107 App. Div. 449.)

WERNER, J. The defendant appeals from a judgment convicting him of the crime of murder in the first degree. The charge set forth in the indictment is that on the 30th day of November, 1905, the defendant did feloniously with premeditation and deliberation shoot Samuel Hinksman with a shot gun, inflicting wounds from which the victim died on the following day.

The deceased was a colored laboring man who lived in the village of Speonk and town of Southampton in the county of Suffolk. He had been twice married. The first wife had died, and the second was not living with him. At the time of the homicide the family consisted of the deceased, his son, the defendant, then about twenty years of age, Annie, a young daughter, and Ella Brown the housekeeper. All of these persons were in the house except the defendant when a shot was fired from the outside, which penetrated the house through a kitchen window in the range of which the deceased was standing. Upon hearing the shot Ella Brown went to the kitchen where she found the deceased unconscious on the floor from the effect of one or more gunshot wounds in his head. She at once went to the door which formed the entrance to the house, and shouted " murder " three times, and then returned to the kitchen where the daughter was wailing over the apparently lifeless body of her father. After taking her from the room Ella Brown again went to the entrance door and again cried, " Murder, murder, murder, someone help me." At this juncture the defendant approached the house and, according to the witness Brown inquired, " Is Pop shot? " to which she replied, " Your father, your father, your father." The defendant's version of the affair is that upon nearing the house he heard Ella Brown crying out murder and as he ran toward her she exclaimed, " Some one has shot your Pop," and that he then inquired, " Is Pop shot? " The two went into the house. The woman testified that the defendant saw his father prone and bleeding but offered no assistance except to suggest that he would go out and get help. The defendant's own story is to the effect that he assisted in placing his father upon a couch; that he then went out among the neighbors for help; and that during the night he waited upon his father to some extent. The wounded man lingered unconscious until the following day, when he died. As there were no eye-witnesses to the shooting, the authorities spent several days in developing the antecedent and

attendant circumstances, with the result that the defendant was arrested and charged with the murder of his father. The circumstances uncovered in the investigation were relied upon by the prosecution to support the theory that the defendant shot his father in order to obtain complete possession of the homestead, where he wished to live with the young woman whom he was intending to marry, and as an incident of this theory it was claimed that the father's matrimonial complications, and the young man's intentions, had led to quarrels which, with other misunderstandings, had created bitter feeling between the father and son.

The evidence tended to show that the defendant, when engaged as a laborer or farm hand, did not live at the house with his father, but only when he was out of work. The Hinksman homestead was a small house upon an acre or less of land. Although there was no evidence as to the actual ownership of these premises, it is to be inferred that the title to the land was in an uncle of the defendant, and the house had been bought or built with money belonging to the defendant's mother. After her death the defendant's father had remarried but, as already stated, the second wife was not a member of his household at the time when he was killed. The defendant was engaged to be married to a young woman who lived in a neighboring town and was anxious to bring her to the Hinksman home, but the father objected. The young man is said to have taken legal counsel as to his rights in the matter, claiming that he was as much entitled to live there with a wife as the father and his wife. Just how much of trouble arose over this does not clearly appear, but there was evidence enough to have warranted the jury in finding there was some ill will between the father and son which may have been due primarily to the difference of opinion upon this subject and was somewhat accentuated by other misunderstandings.

Passing for the moment some intermediate events which led the authorities to suspect the defendant of this crime, the record

discloses that the defendant had been in or about the house during the greater part of the day of the homicide. In the forenoon he had gone to the village doctor for medicine for Ella Brown, and also for some wine and liquor for the Thanksgiving dinner, which was partaken of at about two o'clock in the afternoon. Later in the day the defendant and his father laid a carpet, and the latter found some fault with the former for the manner in which it was done. Soon after eight o'clock in the evening the defendant went from the house, stating that he was going to the doctor's in Eastport to get some medicine for his sister, and Ella Brown told him he need not go, for it was then too late. The defendant went to Eastport but did not call at the doctor's office, for the reason, as he explained on the witness stand, that he found it was too late when he got there. He went to a saloon, however, where he inquired for one French, a friend of his, stating that he had an appointment to meet him there. This statement was challenged by French as false, for he testified that there had been no such appointment. At twenty minutes after nine the defendant left the saloon for his home which was about a mile and a half distant. His first visible appearance at the house was just after Ella Brown had raised the cry of murder, and this circumstance, coupled with the defendant's apparently purposeless visit to Eastport, and supplemented by the fact that the distance between that hamlet and the Hinksman house could easily be covered by an ordinary walker in less than forty minutes, created suspicions against the defendant which led to a search for further evidence.

This search brought to light a number of circumstances of significance, the first of which is that the defendant denied having heard any shots, although his sudden appearance after Ella Brown's outcry was proof positive that he must have been in close proximity to the house when the shot was fired. Taking into account the fact that it was a cold, clear night, and that a witness living three and a half miles distant had heard a shot in

the direction of the Hinksman house just before ten o'clock, the defendant's denial was, to say the least, not calculated to strengthen the presumption of his innocence. Investigation led to the discovery that the weapon from which the shot had been fired had been loaded with bicycle ball bearings, consisting of cylindrical steel balls about a quarter of an inch in diameter, of which some fifteen or sixteen were extracted from the kitchen walls. The defendant admitted that he had been the owner of an old bicycle from which the ball bearings had been removed, and some of which he had exhibited on at least one occasion previous to the homicide. The number of these bearings taken from the kitchen walls furnished demonstrative proof that no cartridge shell could have held them all, and this fact logically led to the conclusion that the shooting must have been done with a muzzle-loading gun and not a breech loader. The defendant was not known to have possessed or owned a gun, and he denied ever having had or owned one. It appeared, however, that on the Sunday previous to the shooting the defendant asked one Robinson if he had a gun to sell, stating that he wished to go gunning on Thanksgiving day. Robinson possessed a gun but refused to sell it. He told the defendant that his employer Rogers had a gun, and on the day before the homicide the defendant went to the Rogers place, saw Robinson, and examined a single barrel muzzle-loading gun that belonged to Rogers. That same evening the defendant and Robinson met at the village store, the former being the first to leave for home. The next morning Robinson discovered that the Rogers gun and a box of caps had been taken from the Robinson room, which was never locked. It further appeared from the testimony of Ella Brown that a short time before the day of the homicide she had found two articles, which she was then unable to name, but which she subsequently identified as cartridges. Winters, the witness who searched the Hinksman house just after the homicide, found in the defendant's room two bicycle ball bearings like those found embedded in the

kitchen walls, and others of the same kind were found in other parts of the house. On a work bench in the room where the defendant had slept were found two cartridge shells from which the powder, shot and wadding had been extracted. There were several old guns about the house, but none that were fit for use. The gun from which the fatal shot had been fired was never found, and Rogers testified that his gun, which had been taken from Robinson's room, was a muzzle loader which he had never seen since its disappearance on the night preceding the homicide. Before daylight on the morning after the shooting the defendant left the house and was gone for a considerable time. After his return he remained upon the premises the rest of the day. On the next day that is, on Saturday, the defendant brought to the house the young woman whom he was engaged to marry, and they occupied the same room and bed together until the following Monday, when the defendant was arrested.

The foregoing circumstances, and some others of lesser importance to which we have not alluded, formed the chain of circumstances relied upon by the prosecution to secure the defendant's conviction. As to the defense, it is enough for present purposes to say that the defendant denied many, if not all, of the facts which tended to incriminate him, and that there was some evidence elicited for the purpose of throwing suspicion as to this crime upon some one else than the defendant. Thus the most conspicuous fact in the case is that the evidence against the defendant, taken as a whole, was not strong, and yet we cannot say that it was so weak as not to support the verdict of the jury. We emphasize that circumstance because material and substantial errors in rulings can never be overlooked in cases where, as in the case at bar, the chain of evidence may be technically unbroken, and yet be so weak as to yield to the attack of very slight opposing facts or circumstances. Errors committed in such cases may in themselves be sufficient to balance the scales against a

defendant, although they might prove absolutely harmless in cases where the proof is so clear and cogent as to dispel all doubt.

A number of errors are assigned by counsel for the defendant, but there are only two which seem to us to require discussion, and these relate to a single subject. The first is that the learned trial court permitted the prosecution to give evidence of the defendant's general bad reputation, over the objection and exception of the defendant's counsel, although the defendant had not opened the door for the admission of such evidence; and the second is that the district attorney, in his summary of the case to the jury, was permitted to dwell upon this feature of the case with great emphasis, reiteration and force.

It appears that the defendant had been called as a witness in his own behalf. He had stated, in some detail, the history of his life, and had specifically denied the more serious of the circumstances calculated to connect him with the shooting of his father. Just at the conclusion of his direct examination his counsel had evidently asked him if he had ever been in any trouble, for, as the narrative of the record has it, the defendant testified: " I had a little trouble once; I was convicted of grand larceny, second degree. That was for stealing something. That was the only trouble I ever had in my life, and it was three years ago. Sentence was suspended on me. I have been a good boy ever since."

Upon the bit of testimony just quoted, and after the defendant had rested his case, the prosecution claimed the right to give evidence as to the defendant's general reputation. The defense objected, but the court sustained the contention of the prosecution and admitted the evidence. Several of the influential men of that vicinity testified that the defendant's general reputation was bad, and his evidence was dwelt upon, as has been stated, with much force in the address of the district attorney to the jury.

The spur of a strong imagination is hardly necessary to convince the average person of intelligence that evidence of general

bad character, produced against a defendant charged with the commission of a crime, can never be helpful to the accused, and, in a case where the opposing facts are very evenly balanced, or the direct case against him is weak, such evidence may be the factor which determines the result against him. In the very nature of things must this be true when the evidence is purely circumstantial. It may be taken for granted, therefore, that the evidence tending to establish the defendant's bad reputation was harmful to him, and the only question to be considered is whether it was competent.

Briefly stated, the contention of the learned prosecutor is that the defendant made this evidence competent by voluntarily assuming the character of a witness in his own behalf. The defendant insists, however, that his character could not be put in issue until he did it himself; that by becoming a witness he did not proffer for scrutiny his general character, but merely his reputation for truthfulness, and that the very scant reference in his testimony to his conduct subsequent to his conviction of larceny and prior to the homicide did not open the door to an investigation of his general character. Stephens, in his Treatise on the Law of Evidence, says that the word " character," when used in the sense in which it is here employed, means reputation as distinguished from disposition, and that, of course, is the general understanding of the profession. The rule laid down by that learned author upon the subject under discussion is that, " In criminal proceedings, the fact that the person accused has a good character, is deemed to be relevant, but the fact that he has a bad character is deemed to be irrelevant, unless it is itself a fact in issue, or unless evidence has been given that he has a good character, in which case evidence that he has a bad character is admissible." (Stephens Digest of Ev. [2d. ed.] p. 158.)

This short yet comprehensive statement embodies the rule as we believe it to have existed in this state both before and since the law has made it competent for an accused person to be a

witness in his own behalf. Other learned writers on the law of evidence are credited, however, with having added to that rule a suggestion which has given rise to the contention at bar. The rule as stated in Elliott on Evidence (Vol. 4, sec. 2721) is that the prosecution cannot give evidence of a defendant's bad character " unless he has introduced evidence of good character, *except where he is a witness, in which case such evidence is admissible to impeach him, as in the case of other witnesses."* And to the same effect is the statement in Hughes Criminal Law (Sec. 3155) : " It is a fundamental principle of the criminal law, that the character of a defendant cannot be impeached or attacked by the state unless he puts his character in issue, *either by becoming a witness in his own behalf,* or by offering evidence in support of his character." As authority for this statement of the rule by the last named author he cites Greenleaf on Ev. (Vol. 3, sec. 25) and Underhill's Cr. Ev. (Secs. 66 and 78) ; but a reference to those treatises clearly shows that the meaning attributed by the district attorney to the text of Hughes is not borne out by the citations. Greenleaf says (Sec. 25) : " But the prosecutor is not allowed to call witnesses to the general bad character of the prisoner, unless to rebut the evidence of his good character already adduced by the prisoner," and he adds, that even this has recently been denied in England. The citation to Underhill is even more pointedly against the contention of the learned district attorney. In section 66 of his work the author says: " Whether the accused may be impeached by proving bad character to the same extent as other witnesses, depends largely upon the statutes rendering him competent as a witness. *His bad character for veracity alone may always be shown to impeach him.* But here a difficult question suggests itself. Can the general bad character of the accused be shown solely for the purpose of impeaching him as a witness in case he has not, as the accused, first offered evidence of good character? Where the statute expressly provides that the accused when testifying as a witness subjects

himself to the same rules of examination as any witness, the
weight of the cases maintain the affirmative, at least in those
states where the general bad character of a witness may be shown.
If, however, the statute does not expressly provide that the ac-
cused may be examined or impeached as other witnesses his
general character is protected from attack."

The law in this state governing the right of accused persons to
testify in their own behalf is now contained in section 393 of the
Code of Criminal Procedure which provides that " The defend-
ant in all cases may testify as a witness in his own behalf, but his
neglect or refusal to testify does not create any presumption
against him." This section of the Criminal Code is identical in
scope and effect with the statute of 1869, which remained in
force until 1886, by which a person accused of crime was given
the right to testify in his own behalf, and it will be observed that
the privilege is conferred without limitation or qualification.
We may, therefore, accept as applicable to this case Mr. Under-
hill's statement that when the statute does not expressly provide
that the accused may be examined or impeached the same as other
witnesses, his general character is protected from attack, for our
statute is silent upon that subject. But we may safely go farther.
Logically a defendant who voluntarily testifies in his own behalf
occupies a dual position. He is at once a party and a witness
and is entitled to the rights and privileges of each. As a party
he need not testify at all. If he deems it prudent to remain
silent no presumption is to be indulged against him. If he pre-
fers to testify his general character is safe from attack until he
puts it in issue by himself introducing evidence relating to it.
But when he assumes the character of a witness he exposes him-
self to the legitimate attacks which may be made upon any wit-
ness. Other witnesses may be called to impeach his credibility
by showing that his general reputation for veracity is bad, or he
may upon cross-examination be interrogated as to any specific act
or thing which may affect his character and tend to show that he

is not worthy of belief. This latter phase of the well-known rule is seized upon by the learned district attorney to sustain the reception of the evidence tending to establish the defendant's general bad character. He argues that if a defendant who testifies in his own behalf can be subjected to a cross-examination which demolishes his presumptively good character and shows it to be utterly bad, it is in effect nothing more nor less than attacking his general character. That may be precisely the effect of a cross-examination which demonstrates that a defendant's character is bad. The difference is more in the method than in the result. If a man's bad character is proven by his own admissions of specified acts, a jury will usually have no difficulty in determining the extent to which his credibility is impaired. But when the conclusions of a jury depend entirely upon the opinions of witnesses who are testifying to a defendant's general reputation based upon the speech of others, and not to any concrete fact of personal knowledge, the method is, to say the least, far less reliable, although the result in a particular case may be just the same. Proof of general reputation by hearsay is one of the exceptions to the general rule that facts and not conclusions constitute legal evidence. It is one of those unsatisfactory exceptions which is recognized as a make-shift and is tolerated only because we do not seem to be able to improve upon it. Much might be written upon the reasons for this exception, and much more about the considerations which have led the courts in some other jurisdictions to hold that a defendant who testifies in a criminal action or proceeding against him may be impeached by evidence tending to establish his general bad character. It could not be done, however, without considerable prolixity and it is doubtful whether it would be profitable. We shall content ourselves, therefore, with a few observations upon the authorities in this state which are relied upon respectively by the district attorney and the counsel for the defendant in their contentions upon this question.

The learned district attorney very correctly argues that it is

the well-established rule in this state that a defendant in a crim-
inal action who offers himself as a witness may be interrogated
as to any vicious or criminal act of his life. (*People* v. *Webster,*
139 N. Y. 73; 10 N. Y. Crim. 486; *Brandon* v. *People,* 42
N. Y. 265; *People* v. *Giblin,* 115 N. Y. 196; *People* v. *McCor-
mick,* 135 N. Y. 663; 10 N. Y. Crim. 219; *People* v. *Casey,* 72
N. Y. 393.)   From this he argues, as has been stated, that a
defendant's general character is thus put in issue and, he adds,
that if it can be done in that way it should be no less open to an
attack through the testimony of witnesses who know the defend-
ant's general reputation.   We have already given some reasons
why this should not be permitted unless the defendant has in-
vited the attack by putting his general character into the balance,
but we must briefly refer to several cases cited in support of the
district attorney's argument.   The first is *Burdick* v. *People* (58
Barb. 51), in which the plaintiff in error was a witness in his
own behalf.   The People offered evidence of the general bad char-
acter of the prisoner for the purpose of impeaching his character
and credibility as a witness.   The evidence was received over his
counsel's objection and the Supreme Court upheld the ruling.   In
the opinion of Mr. Justice JOHNSON there are some very broad
statements, indicating that the court was of the opinion that a
defendant in a criminal action, by offering himself as a witness,
puts in issue his general character for all purposes.   But a care-
ful reading of the whole case in the light of the question actually
decided leaves a different impression.   The learned jurist who
wrote for the court in that case begins by stating that one of the
questions arose upon the admission of evidence " to impeach the
prisoner's character for truth and veracity as a witness."   Ad-
dressing himself to that question he said: " The statute which
allows a prisoner upon a trial for crime, to become a witness in
his own behalf, at his own election, does not protect him from
being impeached, the same as any other witness."   That observa-
tion is entirely within bounds and I think was intended to qualify

or limit the statement that when a prisoner " avails himself of the privilege granted by the recent statute (1869), of testifying as a witness in his own behalf, he necessarily puts his general character and credibility as a witness in issue, and makes it the proper subject of evidence on that question." The next case to which the district attorney refers is *Adams* v. *People* (9 Hun, 89). There the plaintiff in error was tried and convicted upon the charge of conspiracy to defraud. In the first instance the accused offered no evidence of good character. He testified in his own behalf and then the prosecution introduced evidence of his bad character. Then the accused gave evidence of his good character. When the case was submitted to the jury the trial court was requested to charge " that unless the defendant offers in the first place affirmative evidence of character, the question of character, in case he is a witness, relates only to his standing and credibility as such." This request was refused, because the court thought that when the question of character had been legitimately gone into it was in the case for all purposes. At General Term the court assumed that this refusal to charge, and the charge as made, constituted error, but concluded that it was harmless, because it gave the accused a possible chance of acquittal based upon the presumption of innocence that may have been raised by the evidence of his good character; a chance which the learned court seemed to think the accused would not have had if the evidence had been limited to his character for truth and veracity. The learned writer of the opinion argued that " the evidence was capable of being used for but two purposes: first by way of discrediting the testimony of the accused, and secondly as a foundation for the presumption of innocence of the crime charged." And he added by way of conclusion: " No doubt the first was proper. If the second was improper, the charge gave the accused the benefit of it." The obvious answer to the suggestion that the defendant in that case had the benefit of the evidence tending to establish his good character is, that the jury evidently decided

that his character was bad, for they convicted him. Had the accused first given evidence to establish his good character, he would have invited that issue with the chance of defeat upon it. But since he offered evidence of good character purely in self-defense, we think the conceded error of receiving the evidence of the defendant's bad character upon the general issue was clearly prejudicial, and that the judgment in that case should have been reversed. In considering the other conclusion of the learned court in that case to the effect that evidence of the bad reputation of a defendant in a criminal action is competent as bearing upon his credibility when he-testifies in his own behalf, we observe the same extreme breadth of statement that has been referred to as appearing in *Burdick* v. *People* (*supra*). We think that evidence of general bad character, which is nothing but evidence of general reputation, should not be considered competent to decide the issue whether a defendant who testifies in his own behalf is worthy of belief, any more than evidence of a reputation for untruthfulness should be directly decisive of his guilt or innocence. A man may have the reputation of being a liar and yet scorn to steal sheep; and by the same rule, one who cannot resist the temptation to commit larceny may never lie about it. It is true, of course, that if a man is proven a liar, his statement that he did not commit a particular crime, will be much less likely to command belief than it would if he were reputed to be a truthful man. It may be equally true that proof of a man's reputation for general depravity may involve his credibility; but it also involves much more. In addition to undermining his credit for veracity it stamps him as a generally bad man who would be much more likely to commit a particular crime than he whose reputation is good. That is precisely the evil which it was designed to thwart with the rule that a defendant's general reputation cannot be shown against him until he puts it in issue himself. For these reasons we must decline to follow the cases of *Burdick* and *Adams* above referred to in so far as they favor the doctrine that evi-

dence of a defendant's general bad reputation is competent simply because he is a witness in his own behalf. We prefer to stand upon the rule, which we repeat in the language of Abbott: " Whatever the crime charged, the prosecution cannot give evidence of bad character of the accused unless the accused has first adduced evidence of good character as tending to support the presumption of innocence." (Abb. Tr. Brf. sec. 89.) And that we think is the position which this court has hitherto taken in several cases where the question was considered, although not as directly presented as in the case at bar.

In the case of *Brandon* v. *People* (42 N. Y. 265) the accused was tried and convicted on the charge of larceny. She was a witness in her own behalf, and on her cross-examination was asked, " Have you ever been arrested before for theft ? " This question was objected to on the ground that it was an attack upon the character of the accused which she had not put in issue. The objection was overruled and on appeal to this court it was held that the question was proper. It will be observed that this case falls within the category of *People* v. *Webster* (*supra*) and other cases in which it was held that a defendant who is a witness in his own behalf may be interrogated as to any vicious or criminal act of his life. We refer to it not as a precise authority but as indicating the attitude of this court upon this general subject at a time when the statute of 1869 had just been passed. Speaking of the dual position of the accused this court said: " She became and was a competent witness. For this purpose she left her position as a defendant and, while upon the stand, was subject to the same rules and called upon to submit to the same tests which could by law be applied to other witnesses." In the case of *People* v. *Greenwall* (108 N. Y. 296) the defendant was convicted of the crime of burglary. The evidence against him was purely circumstantial. He was called as a witness in his own behalf and on cross-examination was interrogated as to another burglary. Upon re-examination he denied that he had ever en-

tered any man's house with intent to steal, and thereupon a wit-
ness was called by the prosecution and permitted to testify that
the defendant did burglariously enter his house.    After dis-
cussing various other grounds upon which this evidence was
deemed incompetent, this court, speaking through EARL, J.,
said: "Nor was it competent in rebuttal of evidence introduced
by the defendant on his own behalf as to his good character.    It
is never proper for the purpose of impeaching the character of a
party or a witness to call witnesses to prove specific acts of dis-
honesty, immorality or crime.    If the People desired to prove
that the defendant's character was bad the only course open to
them was to call witnesses who were acquainted with his charac-
ter.    (*Commonwealth* v. *O'Brien,* 119 Mass. 342; *Troup* v.
*Sherwood,* 3 Johns. Ch. 558; *Wehrkamp* v. *Willet,* 4 Abb. Ct.
App. Dec. 548; *Bakeman* v. *Rose,* 18 Wend. 146; *People* v.
*Rector,* 19 id. 569; *Corning* v. *Corning,* 6 N. Y. 97; *Rathbun* v.
*Ross,* 46 Barb. 127; 1 Greenleaf's Evidence, sec. 461.)    But
there was no foundation for calling witnesses to impeach the de-
fendant's character.    He had not by any evidence on his part
really put his character in issue."    In the recent case of *People* v.
*Pekarz* (185 N. Y. 470; 20 N. Y. Crim. Rep. 159) the defend-
ant was convicted of the crime of murder in the first degree, and
that conviction was affirmed by this court.    The defendant there
testified in his own behalf and the trial court was asked to charge
that "in the absence of any testimony on the subject of the char-
acter of the defendant, the presumption is that the defendant's
character was good, prior to this offense."    The court declined to
make that charge and stated, in substance, that there is no legal
presumption as to character, one way or the other, but that there
is always the legal presumption of innocence.    In discussing that
feature of the case Judge VANN said for this court: "When,
however, no evidence has been given upon the subject by the de-
fendant, who alone can open the door, his character is not in

issue and he is not entitled to the instruction ' that the presumption that his character is good, must be considered by the jury.' "

Having concluded that it was error for the trial court to admit the evidence of the defendant's general bad character under the circumstances above stated, we have no hesitation in deciding that the district attorney's references to the same were clearly unauthorized and very prejudicial. In his summary to the jury we find the following language: " I say that a man who will steal is bad, and when these men testify and tell you about his reputation they speak the truth. Our friend would not cross-examine them. Why? Because he dare not. What could he say to them? Nothing. Why did he not bring out the details of how they knew he was bad? He dare not; that is why. All that I could ask of them was asked. I asked them if they knew Otis and knew his general reputation, and if so was it good or bad, and they all said bad. He never asked them a question, never." And again the district attorney said, " If Otis could have put witnesses on the stand as to his good character he had a right to do it; if he could have found a witness to testify to his good character he could have put him on, as evidence of good character sometimes is sufficient to raise a reasonable doubt in the minds of a jury, but he has never produced such a witness; of all the people in Westhampton and Speonk, not a single person have they subpœnaed to say that Otis's character was good. It is a strange thing; it is very strange that he is so bad that there is not one person to say that he has a good character; there must be something in that. He is bad; there is no doubt about it." That these statements of the district attorney, made with the sanction of the trial court, must have been extremely prejudicial to the defendant, is too obvious for discussion.

We conclude, therefore, that the judgment of conviction herein must be reversed and a new trial ordered.

CULLEN, Ch. J., HAIGHT, VANN, WILLARD BARTLETT and CHASE, JJ., concur.

GRAY, J.    I dissent.    The evidence, it is conceded, fully justified the verdict of the jurors and no error was committed so serious to the defendant as to justify us in reversing the judgment of conviction.    I do not think that it was erroneous to allow the People to show, by evidence of the defendant's reputation in the community where he had resided, that his conduct, since his previous conviction for a criminal offense, had not been good, as he had testified when offered as a witness in his own behalf. The door had been, thus, opened for the admission of evidence as to his reputation.    It was the right, if not the duty, of the prosecution to rebut the defendant's testimony and the most effective way to do so was to adduce the testimony of those who knew in what repute he was held.

Judgment reversed, etc.