### PEOPLE v. BARRY.

(Supreme Court, Appellate Division, First Department. May 7, 1909.)

1. EMBEZZLEMENT (§ 44*)—LARCENY BY BAILEE—PERSONS LIABLE—EVIDENCE.

In a prosecution for the larceny of promissory notes intrusted to an agent for the purpose of sale and discount, evidence *held* to show that defendant was acting in concert with the agent in a scheme to deprive the owner of them.

[Ed. Note.—For other cases, see Embezzlement, Dec. Dig. § 44.*]

2. EMBEZZLEMENT (§ 44*)—LARCENY BY BAILEE—NOTES—EVIDENCE.

In a prosecution for larceny by a bailee of promissory notes, a defense that the notes were intrusted to defendant for the purpose of sale and discount and for that purpose he had made contracts with others, which prevented him from returning the notes on demand, and that he acted on the advice of an attorney and therefore could not be guilty of larceny under Pen. Code, § 528, par. 2, providing that a person who, with intent to deprive the owner of any evidence of debts, appropriates the same to his own use, steals such property and is guilty of larceny, is not sustained, where the evidence shows that defendant exercised control over the notes and attempted to negotiate them after a demand made for a return of all the notes held by defendant.

[Ed. Note.—For other cases, see Embezzlement, Dec. Dig. § 44.*]

3. CRIMINAL LAW (§ 511*)—ACCOMPLICES—CORROBORATION.

Under Code Cr. Proc. § 399, providing that a conviction cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the crime, the corroborative testimony need not of itself be sufficient to prove that the

defendant committed the crime, but it is enough if it merely tends to connect him with the crime.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1127–1137; Dec. Dig. § 511.*]

4. CRIMINAL LAW (§ 741*)—CORROBORATION OF ACCOMPLICES—QUESTION FOR JURY.

Whether there is sufficient corroboration of the testimony of an accomplice under Code Cr. Proc. § 399, forbidding a conviction on the uncorroborated testimony of an accomplice, is for the jury, if the evidence fairly tends to show the connection of defendant with the crime.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1717; Dec. Dig. § 741.*]

5. CRIMINAL LAW (§ 741*)—CORROBORATION OF ACCOMPLICE—QUESTION FOR JURY—SUFFICIENCY OF EVIDENCE.

In a prosecution for larceny by a bailee of promissory notes based on the testimony of an accomplice, evidence *held* to take to the jury the question of the sufficiency of the evidence corroborating the accomplice within Code Cr. Proc. § 399, forbidding a conviction on the uncorroborated testimony of an accomplice.

[Ed. Note.—For other cases, see Criminal Law, Dec. Dig. § 741.*]

6. WITNESSES (§ 269*)—CROSS-EXAMINATION OF DEFENDANT—DISCRETION.

Where a defendant in a criminal prosecution on direct examination gives an account of his whole life, it is not an abuse of discretion to allow a cross-examination of the defendant to be equally broad.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 949–954; Dec. Dig. § 269.*]

7. CRIMINAL LAW (§ 730*)—ARGUMENT OF COUNSEL—ACTION OF COURT.

Defendant cannot complain of remarks of counsel in his argument, where, at his request, the court charges that such remarks be stricken out and be disregarded.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1693; Dec. Dig. § 730.*]

8. EMBEZZLEMENT (§ 44*)—PROMISSORY NOTES—VALUE.

Under the express provisions of Pen. Code, § 545, that, if the thing stolen consists of a written instrument being an evidence of debt, the amount of money due thereon or secured to be paid thereby is deemed the value of the thing stolen, it cannot be claimed that there was no evidence of the value of promissory notes for the embezzlement of which defendant is prosecuted, where the notes were issued by a going concern duly authorized by its directors and would be a valid obligation in the hands of bona fide holders.

[Ed. Note.—For other cases, see Embezzlement, Dec. Dig. § 44.*]

Appeal from Court of General Sessions, New York County.

Charles Barry, impleaded with John Gundlach, was convicted of larceny as bailee, and appeals. Affirmed.

Argued before PATTERSON, P. J., and INGRAHAM, CLARKE, HOUGHTON, and SCOTT, JJ.

Cantwell & Brown (William M. Cantwell, of counsel, and James W. Osborne and Paul Abrahams, on the brief), for appellant.

William Travers Jerome, Dist. Atty. (E. Crosby Kindleberger, of counsel), for the People.

CLARKE, J. The defendant and John Gundlach were jointly indicted for the crime of grand larceny in the first degree. Barry had

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

a separate trial. He was found guilty under the second count of the indictment, which charges larceny as bailee, trustee, and agent under the second paragraph of section 528 of the Penal Code of 36 promissory notes, for $3,000 each.

Sherman & Co. manufactured safety razors and pocket cutlery at Keyport, N. J. Desiring to increase its plant and extend its business, on April 1, 1907, the board of trustees authorized the officers to issue $150,000 worth of notes to obtain money for such purposes. Mr. Sherman, the president of the company, saw an advertisement in the Sunday Herald in the early part of April, 1907, which he answered. He received in reply a letter from Gundlach dated April 16, 1907, who stated that he was in a position to use a large amount of paper. "I have several parties who will indorse the paper and use one-half of it, paying their half on maturity or shortly before, so you will take care of your paper. This is done without any harm to your credit or banks, and your paper will go to different cities for discount. * * * The cost to you for discounting will be the legal discount and 5 per cent. commission for me on your share. If you entertain this proposition, which is certainly the cheapest to you, I wish to hear from you by return mail, so I can make my dispositions and get you returns by the first part of next week." Sherman answered the letter and with his treasurer, Hull, went to New York and met Gundlach on April 21, 1907. Gundlach stated: That he had a number of principals who would use their paper in very large amounts and very quickly; that the paper would be negotiated out of town and not in New York City and would not interfere with their credit. Gundlach spoke of one of his principals in Philadelphia being very wealthy and owning many acres of coal and mineral lands and showed an agreement between Barry and himself reading as follows:

"New York, Feb. 14, 1907. Mr. John Gundlach, Dear Sir: Herewith I agree to pay you a commission of 5 per cent. on my one-half (½) share, or two and one-half per cent. (2½%) of entire face value of all notes, that you procure for me on half basis, and that I succeed in discounting. Said commission to be payable to you immediately out of the proceeds of said notes, and same commission to you for all future business. Charles Barry."

Gundlach then said that Barry could use a large share of the Sherman & Co. paper and could discount more. Barry came into the room, whereupon Gundlach said: "Oh, There is my principal now." There was no introduction at this time. Gundlach and Sherman exchanged references and parted after some general talk. Gundlach gave Sherman a proposed form of contract which was drafted by Barry. Gundlach was a German who could not write English well, and Barry drafted the letters and documents, signed, sent, or delivered by Gundlach, who copied them. Sherman went back to Keyport, and on the next day, April 24th, he wrote Gundlach a letter:

"In accordance with your previous communication and our conversation of yesterday, we inclose you herewith 36 notes of this corporation. * * * These notes are sent you with the distinct understanding that they are to be discounted and that half of the proceeds of each note is to be forwarded to us in bankable funds within twenty-four hours after the discounting. The other half or portion of the proceeds is to be retained by the parties through whom the notes are discounted or negotiated, with the understanding that

each of us, that is, the party negotiating the discount and retaining half the proceeds as well as ourselves, will pay our respective portions promptly on maturity of each note, either in cash or negotiable paper. It is understood that the cost to us for this discount shall be the bank discount on our portion as well as a 5 per cent. commission on our portion. The said commission to be deducted at the time our portion of the proceeds is remitted to us. Further than this, and if you are successful in handling this transaction for us, we hereby agree to let you have all of the commercial paper issued or to be issued by us and to make same. in such amounts as you may require and fully authorize you to contract for the discounting of same on the basis outlined above. * * * Kindly acknowledge receipt of our letter with inclosures and in doing so fix, if possible, an early date, when we will be informed as to the success of your efforts in arranging for the discounting. In this connection we desire to say that we do not want you to hold any of our paper for longer than two weeks after its date. In other words, if you are unable to arrange for its discounting within two weeks after the date of the paper, which will be when you get it, same must be returned to us and we will issue new paper in its stead."

On the 25th of April Gundlach acknowledged in writing the receipt of the notes, and wrote:

"Kindly expect me at your Broad street station to-morrow afternoon about 12:45 p. m. as Mr. Eisenberg requests the indorsement of your officers."

In a previous letter Gundlach had written:

"Beg to submit one of my parties who is in the fur import business, A. M. Eisenberg, 40 W. Thirty-Fourth street. While he is not using any credit here, I understand he is not rated, but is in a position to discount $50,000 or more of your paper; that means, that he must be of high standing with his banks."

Gundlach appeared the next day and examined the manufactory, and the officers indorsed the notes as requested. A short time after this, Hull, the treasurer, went to New York, and met Gundlach and Barry. Gundlach introduced Barry, and Hull asked what position the defendant held with Gundlach. Gundlach said, "Why, he is my principal, he is my adviser." Whereupon Hull said: "Mr. Gundlach, do you realize that we have been doing business with you only? Now, if this man is connected with you, I want to know what kind of position he holds with you?" "Well," he said, "Mr. Barry can speak for himself." Hull said, "Mr. Barry, will you please give me some references." Whereupon Barry proceeded to tell him that he was the principal attorney in the Cronin murder case in Chicago, that he was the secretary of some irrigation company, some $30,000,000 corporation of Chicago, that he was the president of some German association at the World's Fair, that his office was in the Betz building in Philadelphia, that he was associated in business with Maj. Weidemann, who was offered the German consulate under Cleveland's administration. Gundlach spoke up and said, "Well, I am looking for offices for you now, am I not, Mr. Barry?" Barry said, "Yes." Gundlach said, "We are very hard to please. We must have some very nice apartments, suites that will cost about $25,000 a year." Hull said, "Mr. Barry, it must be a very large enterprise you are going into." He said: "Yes, a very gigantic enterprise. You will soon hear of it in the papers." He said, "In fact, I have some very valuable tracts of land, and I am worth $10,000,000." Hull asked him what

he wanted more money for. Barry said he needed it to develop these mineral lands of his. He said that he could use a quantity of Sherman & Co.'s paper, and he could get Maj. Weidemann to use some of it, and suggested that they borrow a quarter of a million dollars instead of what they were trying to get. Hull then asked Gundlach if he had discounted any of the paper, and Gundlach replied, "not for sure," that Maj. Weidemann had two or three pieces and some was in Philadelphia. At Hull's request Gundlach took the rest of the notes out of his pocket and showed them to him in Barry's presence.

The evidence shows a number of communications between Gundlach and Sherman & Co. which were drafted by Barry, but that no money was ever received by Sherman & Co. The only thing it ever did receive for its $108,000 of notes was a $1,500 sight draft of one Trautwein which was unpaid and protested. These notes were hawked about by Barry and Gundlach and finally Sherman & Co., receiving no returns, attempted to get them back. On June 1st the company wrote to Gundlach demanding the return of all the notes. To this Gundlach replied in a long letter drafted by Barry, winding up as follows:

"In conclusion must state that I have considerable of your paper out, all in absolutely responsible hands, that in each case a contract relation has been established, and that I could not, if I were disposed, cancel same without the consent of the other parties, and that I do not propose to involve myself in litigation on your account. You, unaware, are apparently unappreciative of faithful, loyal service."

To this the company replied on June 4th specifically demanding the return of the notes within three days. On the 7th of June Hull went to New York, met Gundlach and Barry, and demanded the return of all the notes. Barry said, "We will see you this afternoon." Hull said, "Wait a minute, Mr. Barry, I want these notes now." Barry got up and said, "We will see you later." Hull said to Gundlach, "I demand all the notes that you have on your person." Gundlach put up his hand as if to produce them, but Barry slapped his hand on him and said, "Not now, at 2 o'clock," and Barry and Gundlach left. Hull thereupon went to Crampton's office to locate some of the notes. Barry and Gundlach came to that office. As soon as they entered they stopped when they saw Hull, who said: "Why, how do you do? I got here first." They stepped out in the corridor, and in a few minutes Barry walked in and placed a letter in Hull's lap, which read:

"I shall not meet you at 2 o'clock, nor any other time, but refer you and Sherman & Co. to the law firm of Messrs. Stickney, McClay & McBurney, 31 Nassau Street, N. Y. C., whom I have retained and who will to-day communicate with Sherman & Co. [Signed] Gundlach."

Hull did not see Barry or Gundlach again until he saw them in court. A portion of the paper was recovered when Gundlach was arrested.

From all the evidence the jury were justified in finding that Barry and Gundlach were working together in the scheme. The appellant claims: That assuming, for the purposes of argument, every fact as true appearing by the people's case, there exists no crime of larceny as bailee, trustee, and agent; that Sherman & Co., having voluntarily

given these notes for the purpose of having them discounted, and subsequently having demanded them back, and Gundlach having refused to do so upon the ground that he was acting under legal advice, claiming a contract which Sherman & Co. had no right to break, it was a matter for the civil courts to determine.

The force and effect of this argument is destroyed, however, by what occurred after the demand and refusal to return the notes on the 7th of June. Campbell testified: That on the 31st of May he received about $60,000 worth of these notes from Gundlach and Barry. That Gundlach and Barry used to call at his office pretty nearly every day. That he received a letter from Mr. Hull about June 1st which he showed to Gundlach and Barry demanding that Campbell return the notes to Hull and not return them to Gundlach, and that they were not to be discounted. That Gundlach and Barry demanded that he should not return the notes to Sherman & Co. That about the middle of June he gave back the notes to Gundlach and received back the receipt which he had given for them. That thereafter Gundlach and Barry called again and asked Campbell to take the notes back again and try to discount them. That he said it would be very hard to do that because the notes would have to be verified, and Sherman & Co. would not do so, when they were demanding their return. That Barry said that that could be arranged, to have the parties who were to discount the notes communicate with him, that he was the New York representative, and that he could satisfy anybody on that point. That Campbell took the notes again and tried to raise money on them. That he found a party who said that he could get about $20,000 on the notes. That he told Barry and Gundlach that of the $20,000 Miller was to get $8,000, Gardner $5,000, himself $5,000, and there would be $2,000 in it for Gundlach; that he would not consent to that. That Barry said if they got half of the $20,000 they would accept it. That they had been to expense and trouble to get people together on the proposition, and that they were going to get something for their trouble. This distribution of the proposed proceeds not being acceptable, that about the 25th of July Campbell gave the notes back.

If this evidence is to be believed, it is proof: That, after Sherman & Co. had demanded the notes back and had put an end to the agency, Barry and Gundlach were exercising dominion and control over said notes against the instructions of their principal and for their own benefit; that they thereby converted the same to their own use and came within the provisions of paragraph 2 of section 528 of the Penal Code, which provides that:

"A person who, with intent to deprive or defraud the true owner of his property, or of the use and benefit thereof, or to appropriate the same to the use of the taker or any other person * * * having in his possession, custody or control as bailee, servant, attorney, agent * * * of any person, association or corporation * * * or as a person authorized by agreement or by competent authority to hold or take such possession, custody or control, any money, property, evidence of debt or contract, article of value of any nature, or thing in action or possession, appropriates the same to his own use or that of any other person, other than the true owner or person entitled to the benefit thereof, steals such property and is guilty of larceny."

But the appellant urges that Campbell was a convict and an accomplice and was not corroborated. Section 399 of the Code of Criminal Procedure provides that:

"A conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the crime."

The plain language of this provision, and the interpretation thereof by the courts, has established the rule that the corroborative testimony need not of itself be sufficient to prove that the defendant committed the crime, but that it is enough if it merely tends to connect him with the commission of the crime. People v. Hooghkerk, 96 N. Y. 149; People v. Elliott, 106 N. Y. 288, 12 N. E. 602. As stated in People v. O'Farrell, 175 N. Y. 323, 67 N. E. 588:

"If there is evidence fairly tending to show such connection so that the conviction will not rest entirely upon the evidence of the accomplice, then the question whether the evidence is a sufficient corroboration to induce the jury to find against the defendant is for it to determine."

The learned court in its charge, in four separate requests tendered by the defendant, carefully and sufficiently instructed the jury that it could not convict upon the testimony of Campbell alone, unless there was other evidence in the case tending to connect defendant with the conversion of the notes.

There is abundant evidence of the direct participation of Barry in all the transactions in relation to these notes down to the time of the demand for their return and refusal on the 7th of June. There is not a particle of doubt but that the notes were redelivered to Campbell after they had been returned by him, and after the 7th of June. This is positively testified to by Gundlach, a witness produced by the defendant, and evidenced by the receipt in writing given to Campbell by Gundlach, so that the conversion after the 7th of June is proved by uncontradicted testimony.

The defendant testified: That he never went to see Campbell in his office at all; that he never went to see Campbell after the notes had been handed back to Gundlach; that he knew nothing whatever at all of Gundlach's second delivery of the notes to Campbell, when it was done, and not until months subsequent; that he never spoke to Campbell in his office after the 1st of June, 1907.

Park testified: That the first time he saw Barry it was at 150 Nassau street in Campbell's office, where he was talking to Campbell in the latter part of May, 1907; that he saw the defendant there again about five or six times after the first time; that he was employed by Campbell at that time at that office and had taken a letter or message to Barry; that he went on a vacation about the middle of July; that he saw Barry in the office talking to Campbell at various times down to that date; that he came in with Gundlach.

Righter, who had desk room in the same offices, testified: That he saw Gundlach come in with Barry and talk to Campbell. That both of them talked to Campbell. The first time was in the month of May. That he had left that office on the 17th of July, and that to the best

of his recollection that Barry came into Campbell's office and talked to Campbell down to the time that he left.

The testimony of these witnesses therefore is a flat contradiction of the defendant's statement and a corroboration of Campbell, in so far as it sustains his evidence that Barry was in the office and talking with him at or about the time that he testified to. Barry wrote a letter to Gundlach dated August 3d, as follows:

"For months I advised you to take legal steps to recover the Sherman & Company, Keyport, N. J., notes from Stein and Campbell; and repeatedly told you that if you failed to do so and got into trouble you need not come to me for aid of any kind. Yesterday I urged you for the last time. In reply you not only refused to follow my advice, but became disrespectful to me. As a consequence that ends our relations, both present and future, and you are hereby notified not to use my name as your personal or business reference. This is my last communication to you and requires no reply from you."

This letter is entirely inconsistent with his testimony that he knew nothing whatever about the second delivery of the notes until months subsequent; and in answer to the question by his own counsel:

"Did you directly or indirectly or remotely aid, advise, counsel, or abet in the second delivery of any notes to Campbell? A. I did not, and, on the contrary, the notes were all left in the safe of Mr. McBurney when I ceased my activity on my own recommendation."

This second delivery was on or about the 15th of June. Yet on August 3d, he writes:

"For months I advised you to take legal steps to recover the notes from Stein and Campbell."

We think that, taking this evidence in connection with all the other evidence in the case which establishes the active participation of Barry in every step of the preliminary proceedings, a pure question of fact was presented for the jury, that the evidence corroborated Campbell, tended to connect the defendant with the commission of the crime, and entitled the jury to draw the inference which the verdict establishes it did draw.

The appellant contends that the cross-examination of the defendant was improper, and it certainly did cover a pretty wide range; but as the defendant commenced his own examination in chief with an account of his early life, from the time of his birth, his education, his business, his associates, and his friends, presumably for the purpose of convincing the jury that it was not probable that such a man could be guilty of the crime charged, he ought not to complain if the cross-examiner marched through the door which he had so widely opened. "It is a well-established rule," said Werner, J., in People v. Hinksman, 192 N. Y. 421, 85 N. E. 676, "in this state that a defendant in a criminal action who offers himself as a witness may be interrogated as to any vicious or criminal act of his life"—citing People v. Webster, 139 N. Y. 73, 34 N. E. 730; Brandon v. People, 42 N. Y. 265; People v. Giblin, 115 N. Y. 196, 21 N. E. 1062, 4 L. R. A. 757; People v. McCormick, 135 N. Y. 663, 32 N. E. 26; People v. Casey, 72 N. Y. 393. We do not think the discretion of the court upon the cross-examination of the defendant was improperly exercised.

The appellant contends that some remarks of the assistant district attorney in the summing up in alluding to the absence of character witnesses for the defendant was reversible error, but the learned court in its charge said:

"At the request of the district attorney, I advise you to disregard the comments made by the district attorney on that evidence, and the comment is withdrawn from your consideration."

So that the motion which defendant's counsel made that the jury be instructed to disregard the remark of the district attorney, and that it be stricken out, was granted by the court.

The appellant claims that the prosecution failed to prove that the notes in question had any value. At the time of the alleged conversion, they were negotiable instruments of a going concern, duly authorized by the directors thereof, and undoubtedly valid obligations for the payment of money in the hands of bona fide holders, and seem to be covered by the provisions of section 545 of the Penal Code that:

"If the thing stolen consists of a written instrument, being an evidence of debt, other than a public or corporate certificate * * * or security having a market value, * * * the amount of money due thereon or secured to be paid thereby and remaining unsatisfied, or which in any contingency might be collected thereon or thereby, or the value of the property transferred or affected, or the title to which is shown thereby, or the sum which might be recovered for the want thereof, as the case may be, is deemed the value of the thing stolen."

And there is nothing in the point taken.

Upon the whole case we find no reversible error.

It follows, therefore, that the judgment appealed from should be affirmed. All concur.