(136 App. Div. 226.)
## PEOPLE v. MEADOWS.
(Supreme Court, Appellate Division, Fourth Department.　January 12, 1910.)

1. EMBEZZLEMENT (§ 14*)—LARCENY BY AGENT.

Accused's firm were brokers in Buffalo with correspondents in New York, and by their course of dealing title to stock bought by their correspondents did not vest in them or their customer until full payment, the correspondents drawing upon the firm for further margin needed before the stock was paid for. S., who had purchased stock several times through accused's firm, directed accused to buy certain stock, stating that it was an investment. Defendant thereafter advised him that it had been purchased, and S. drew a check to the order of the firm, which they indorsed and deposited in their general bank account. Requests by S. for the certificates were met by the statement that the delay was caused by the transfer of the stock. Accused's firm was insolvent when they received the check from S., and was afterward adjudged bankrupt. Nothing was paid on the stock purchased for S., nor was it delivered to him, but a part of the proceeds of his check was paid to the firm's correspondent on general account, and the remainder appropriated to the firm's own use, none of the recipients knowing that the money belonged to S. and the New York correspondent not knowing that the stock was purchased for him. Penal Code, § 528, subd. 2, provides that one who, with intent to deprive or defraud the owner of his property or its benefit or to appropriate it to the taker's use, either having in his possession or control as bailee or agent of any person, or as a person authorized by agreement to hold such possession, any money, etc., appropriates it to his own use, steals such money, and is guilty of larceny. *Held,* that accused was S.'s agent to purchase the stock, and his agency continued until it was delivered as directed, notwithstanding the delay in delivery, and accused was guilty of larceny of money held in a fiduciary capacity.

[Ed. Note.—For other cases, see Embezzlement, Cent. Dig. §§ 13–15; Dec. Dig. § 14.*]

2. EMBEZZLEMENT (§ 4*) — LARCENY IN FIDUCIARY CAPACITY — ELEMENTS OF CRIME.

The essence of the crime of larceny involving embezzlement is breach of confidence.

[Ed. Note.—For other cases, see Embezzlement, Cent. Dig. § 1; Dec. Dig. § 4.*]

3. CRIMINAL LAW (§ 24*)—CRIMINAL INTENT—EVIDENCE.

Criminal intent must be gathered from the facts connected with the principal transaction, and one is ordinarily held to intend what his acts indicate.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 26, 27; Dec. Dig. § 24.*]

4. EMBEZZLEMENT (§ 14*)—ELEMENTS—INTENT.

The crime of larceny by one in a fiduciary capacity is committed if the agent intentionally appropriates money to his own use in violation of his fiduciary relation, though the money was originally received and held lawfully without intent to misappropriate it.

[Ed. Note.—For other cases, see Embezzlement, Cent. Dig. §§ 13–15; Dec. Dig. § 14.*]

5. EMBEZZLEMENT (§ 44*)—PROSECUTION—EVIDENCE.

In a prosecution of a stockbroker for larceny by converting to his own use money received to purchase stock, evidence *held* to sustain a conviction.

[Ed. Note.—For other cases, see Embezzlement, Cent. Dig. §§ 67–70; Dec. Dig. § 44.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

6. CRIMINAL LAW (§ 1170 ½ *)—APPEAL — HARMLESS ERROR — ADMISSION OF EVIDENCE.

In a prosecution of a stockbroker for larceny by appropriating to his own use money received while insolvent to purchase stock for a customer, accused testified in his own behalf as to the nature of the transactions, and that he did not intend to defraud the customer of his money, and on cross-examination he was asked why, in bankruptcy proceedings after the transaction in which he received the money claimed to have been stolen, he availed himself of the privilege of refusing to answer questions involving such transaction on the ground of self-incrimination, and replied that he did so on the advice of his attorney. *Held* that, even if the question was improper, it did not require a reversal of a judgment of conviction otherwise proper.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 3133; Dec. Dig. § 1170½.*]

7. WITNESSES (§ 277*)—CROSS-EXAMINATION—CRIMINAL CASES—CROSS-EXAMINATION OF ACCUSED.

While an accused need not testify for himself, and his omission to do so could not be commented on, if he does testify, he may be cross-examined as any other witness, and an accused who testified as to his intent could be asked on cross-examination any questions legitimately bearing on that subject.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 979–982; Dec. Dig. § 277.*]

8. CRIMINAL LAW (§ 1153*)—WITNESSES (§ 267*)—APPEAL—DISCRETION OF TRIAL COURT—CROSS-EXAMINATION.

The scope and extent of disparaging questions on cross-examination is for the trial court's discretion, and its decision is not reviewable in absence of abuse of discretion.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 3064; Dec. Dig. § 1153;* Witnesses, Cent. Dig. §§ 923–926; Dec. Dig. § 267.*]

Kruse, J., dissenting.

Appeal from Trial Term, Erie County.

Harold G. Meadows was convicted of first degree grand larceny, and from the judgment of conviction, and an order denying a new trial, and an order denying a motion in arrest of judgment, he appeals. Affirmed.

See, also, 62 Misc. Rep. 573, 115 N. Y. Supp. 656.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

Louis L. Babcock, Charles A. Dolson, and Joseph G. Dudley, for appellant.

Guy B. Moore and Wesley C. Dudley, Dist. Atty., for the People.

SPRING, J. The indictment of the defendant for grand larceny in the first degree was found at the January term, 1909, of the Erie County Court, and was subsequently transferred to the Supreme Court. The trial was soon had, resulting in a verdict of guilty on the 5th of March.

The grand larceny charged in the indictment is that defined in subdivision 2 of section 528 of the Penal Code, and formerly known as embezzlement. In more specific terms the charge is that the defendant as the servant, agent, or bailee of one William Silverthorne had

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

in his custody and possession $72,012.50 belonging to said Silverthorne, and with the intent to deprive or defraud said Silverthorne "did then and there feloniously steal said money." In May, 1908, and since 1903, the firm of Meadows, Williams & Co. was engaged on quite an extensive scale in a general brokerage business with offices in the Fidelity & Trust Company building in the city of Buffalo. The defendant Meadows was in charge of the business. Mr. Williams, the other Buffalo partner, took no active part in the affairs of the company, and Mr. De Witt, the remaining partner, resided in New York, and his contribution to the copartnership assets was a seat in the New York Stock Exchange. The New York brokerage correspondents of Meadows, Williams & Co. were Post & Flagg, with whom the defendant's firm had private telegraph wire connection, and Mr. De Witt had desk room in their office. Mr. Silverthorne, the complainant, was a resident of Buffalo and evidently a man of means, and an acquaintance and friend of the defendant. He had purchased stocks of the defendant's firm two or three times, paying cash therefor, and the certificates of stock were made payable to himself or his wife, as he directed, and were delivered to him. He made no purchases on margins, but each stock purchase was intended as an investment. On the 20th of May, 1908, he called at the defendant's office asking for quotations on United States Steel preferred, saying he wished to purchase 700 shares for an investment. The defendant immediately communicated with Post & Flagg of New York, and after two or three telegrams passing Silverthorne directed the defendant to buy 700 shares at 102¾, and the defendant shortly after advised him that the purchase had been made. On the 22d of May Silverthorne received the following memorandum relative to the transaction:

"Memorandum.

"Mr. W. E. Silverthorne,

"From<br>
Meadows, Williams & Co.,<br>
Fidelity Building,<br>
Buffalo, May 21, 1908.

"Bought 700 U. S. Steel pfd. at
   102¾ ............................................... 71925.
      Com. ............................................ 87.50
——————— 72012.50

"Meadows, Williams & Co.,<br>
"Per Wm. H. Coughran.'

Accompanying the same was the following statement:

"Meadows, Williams & Co., Banker and Brokers, Fidelity Building.
"Telephones:
   "Bell, Seneca 2768
   "Frontier 2768.

Buffalo, May 21, 1908.
"Mr. W. E. Silverthorne, No. Tonawanda, N. Y.—Dear Sir: We have this day bought for your account and risk, 700 Steel Pfd. @ 102¾. This account received by telegraph from New York. Names of Parties from whom purchase was made will be given, if desired, as soon as advices are received by mail.
   "Very truly yours,          Meadows, Williams & Co., by C."

On the same day Silverthorne mailed a check on the Columbia National Bank of Buffalo for the full amount stated to the order of

Meadows, Williams & Co., returning the bill or memorandum, which was receipted by that firm and returned to Silverthorne. The check was indorsed by said payees and deposited in their general account in the Bank of Buffalo. Silverthorne two or three times within the next week or ten days inquired of the defendant if his stock had arrived, and each time was advised that it had not been received; the defendant explaining the delay with the statement that it was because of the transfer of the stock in New York. Silverthorne expected to start for Europe early in June, as the defendant knew, and he first directed that the stock be made out in his name and left with Davenport, his clerk, to be deposited in his safe deposit vault in the Manufacturers' & Traders' Bank of Buffalo. Later he told the defendant to keep the certificates in the safe of Meadows, Williams & Co. until his return from Europe, which Meadows agreed to do.

Silverthorne did not know the brokers who were the New York correspondents of Meadows, Williams & Co., nor did he know anything of the stock dealing arrangements existing between Meadows, Williams & Co. and Post & Flagg, or of the manner in which his direction to buy the stock had been carried out. There was nothing in his direction suggesting a purchase on a margin. He expected to pay the full purchase price of the stock immediately upon the presentation of the statement to him as he had done in his previous transactions with the defendant. He supposed the avails of the check were to be used in paying for the 700 shares of the United States Steel preferred, which orally and by the statement rendered to him he was advised had been purchased in pursuance of his order to Meadows, Williams & Co.

At the time the avails of the check were deposited in the Bank of Buffalo to the credit of Meadows, Williams & Co., their credit balance in the bank was about $1,500. Before the 1st of June the greater part of the funds to their credit, including the avails of the check, were paid out by checks to creditors of the firm or to meet the individual obligations of the defendant. A considerable portion was applied on the general indebtedness owing Post & Flagg, although no part was specifically to be applied on the purchase of the 700 shares of the United States Steel preferred. Silverthorne left for Europe on the 4th of June, returning early in September. On the 24th of August Meadows, Williams & Co. were adjudged bankrupts with liabilities aggregating $600,000, and assets amounting to about $85,000, and it is obvious that the firm was hopelessly insolvent at the time it received and deposited to its credit the check of Silverthorne. Nothing was paid by the defendant to Post & Flagg for the 700 shares of United States Steel preferred purchased in pursuance of the order of Silverthorne, and the stock was never delivered to him. Post & Flagg had a list of stocks which it had purchased on the order of Meadows, Williams & Co. By their course of dealing stock purchased was held as security for the general indebtedness of Meadows, Williams & Co., and whenever the New York brokers desired the margins increased they so advised the Buffalo brokers, or drew on them by draft. On the 23d of May their draft for $28,000 was honored by Meadows, Williams & Co. and paid mainly from the avails of the Silverthorne check. Post & Flagg did not know that the United States Steel preferred had been

purchased by Silverthorne. They recognized the orders of Meadows, Williams & Co. without any inquiry or knowledge as to the customers who authorized the purchase to be made.

If the transaction was entirely as evidenced by the memorandum, statement, and receipt, there might be some plausibility in the argument that the stock belonged to Silverthorne. They do not, however, disclose the true transaction. The stock was not, in fact, deliverable to Silverthorne. He could not have obtained it upon demand and payment of the full purchase price to Meadows, Williams & Co. Title in no way was assured to him by payment to them. The purchase by Meadows, Williams & Co. was a fiction, or at best a mere option, and full payment to Post & Flagg was essential before the title became vested in Meadows, Williams & Co. or their principal, Silverthorne. Meadows knew this. Silverthorne did not. He expected payment of the purchase price to Meadows, Williams & Co. assured title in him. Such was not the effect of the payment, and the defendant understood it. Meadows as the agent of Silverthorne knew it was his duty in the evolution of the agency relation to send the check to Post & Flagg, or the avails thereof, and have the certificate of stock made payable and delivered to Silverthorne. In no other way could the purchase and delivery of the property be consummated. The transaction is no different than if Silverthorne had before any attempt to purchase the stock delivered the check to Meadows, Williams & Co., directing them to purchase 700 shares of stock; and, instead of executing the commission with which they were charged, they had diverted the money to their own use. In that case the transaction would be more bald and direct, but in effect the same. In the one case there would be no attempt to execute the trust; and in the other a purchase as a mere matter of bookkeeping without any actual transfer or capability of transfer until full payment. In each case the direction to purchase and deliver the stock was thwarted by the actual diversion of the money by the agent. Silverthorne relied upon the defendant, and believed him when he said the books of the steel company would be closed until June 1st. He was explicit, however, according to his testimony, in requiring the stock to be taken in his name and held until his return from Europe.. The postponement of the delivery did not alter the legal relations of the parties. The agency of Meadows still continued until the transaction culminated in the delivery of the stock in the manner directed by Silverthorne.

When Silverthorne delivered the check, he had the right to assume either that the payees named had already purchased the stock and paid for it and had it ready to deliver, or that it was purchased, to be paid for by the check, or its avails, which he delivered to them. The defendant knew the exact situation in regard to the stock. Silverthorne did not. If Meadows had informed Silverthorne that nothing had in fact been paid on the 700 shares, that the avails of the check would be placed in the bank to the credit of Meadows, Williams & Co. and checked out in the payment of their general obligations, and that at some future time they would procure the stock, very evidently the check would not have been delivered.

The fallacy of the appellant's position is that he assumes the defend-

ant had purchased 700 shares of stock which belonged to Silverthorne upon the payment of the purchase price, or even before. Such was not the true status of the transaction. The stock had been purchased or obtained by Post & Flagg, but it was not deliverable until they had received payment in full. The following illustration may elucidate the status of the parties. A. wishes to buy a black mare, Hambletonian breed, seven years old and twelve hands high. He engages B., a horse dealer, to find a mare of that description. B., after a day or two, advises him he can purchase such a mare of another dealer for $2,000 and A. orders the purchase to be made. B. writes him he has bought the mare, and sends a memorandum or bill for $2,000 and $50 commissions, for which A. sends his check in payment and which B. puts in the bank to his own credit, and afterwards pays out on his own obligations. Now, if the mare is ready to be delivered to A., possibly the money paid by him belongs to B., and A. is entitled to the mare. If, however, as B. knew when the money was paid, the mare had not been paid for, but has been turned loose with 20 others which B. ordered purchased and which have not been paid for, and all of which are by agreement held as security for the whole indebtedness, then the appropriation of the money by B. is an embezzlement. A. has received no equivalent for his check. There never was an actual purchase made.

The chief features of the transaction are undisputed, and, it seems to me, they clearly show that Meadows was employed at a fixed compensation by Silverthorne to purchase the United States Steel stock preferred at a definite price. The money or its equivalent was delivered by the principal to the agent for the specific purpose of paying for the stock which the agent reported he had purchased in compliance with the directions of his principal. The money received in this fiduciary capacity, instead of being used as Silverthorne intended, and as Meadows realized was necessary in order to fulfill his obligation to his principal, was commingled with the funds of the defendant and appropriated by him to his own use.

Section 528 of the Penal Code provides:

"A person who, with intent to deprive or defraud the true owner of his property, or of the use and benefit thereof, or to appropriate the same to the use of the taker, or of any other person, either  *  *  *  (2) having in his possession, custody or control, as a bailee, servant, attorney, agent, clerk, trustee, or officer of any person, association or corporation, or as a public officer, or as a person authorized by agreement, or by competent authority, to hold or take such possession, custody or control, any money, property, evidence of debt or contract, article of value of any nature, or thing in action or possession, appropriates the same to his own use, or that of another person other than the true owner or person entitled to the benefit thereof: steals such property, and is guilty of larceny."

The elements constituting the crime defined in the statute quoted were proved. People v. Hazard, 28 App. Div. 304, 50 N. Y. Supp. 1023, affirmed 158 N. Y. 727, 53 N. E. 1129; People v. Kellogg, 105 App. Div. 505, 514, 94 N. Y. Supp. 617 et seq.; People v. Birnbaum, 114 App. Div. 480, 100 N. Y. Supp. 160; People v. Civille, 44 Hun, 497; People v. Miller, 169 N. Y. 339, 62 N. E. 418, 88 Am. St. Rep. 546; Commonwealth v. Cooper, 130 Mass. 285. The gravamen of the

crime is the appropriation of the money or property with intent to defraud, etc., by one lawfully in possession of the same, but as the agent, bailee, or servant of another. The jury have found that the defendant came rightfully into possession of the check from Silverthorne and as his agent or bailee to consummate the purchase of the stock in order that title to the same should become vested in Silverthorne; that "with the intent to deprive or defraud" Silverthorne of his money he embezzled the same by appropriating it to his own use.

The learned counsel for the defendant claims that, after the receipt and use of the check, the relation of debtor and creditor existed between the payees and drawer of the check. The proposition of necessity implies that the United States Steel stock became the property of Silverthorne instantly upon its purchase. The evidence is undisputed that it was the invariable practice of Post & Flagg to hold any stock which they purchased on the order of Meadows, Williams & Co. until payment therefor was made. Payment to the Buffalo brokers was not payment to them. The dealings of the New York correspondents were entirely with Meadows, Williams & Co., and not with the clients or patrons of that firm. Nor were the defendant's firm recognized as the agents of the New York firm to receive payments of stock. Possibly Silverthorne as an undisclosed principal might by tendering the purchase price of the stock to Post & Flagg have been entitled to its transfer to him. If so, the defendant is not relieved from the charge of embezzling the money of Silverthorne which was intended to pay for this stock.

Again, the debtor and creditor argument involves the proposition that the defendant might lawfully and properly mingle the avails of the check with his own funds and use them as he did in the payment of his own debts and in every respect like money paid to him for goods purchased and delivered, or salary earned, or acquired in any other manner unquestionably his own. The transaction is not susceptible of that construction. Meadows & Co. were the agents of Silverthorne to purchase this stock for a fixed compensation, and the money was paid to them to carry out the arrangement.

It is claimed that Silverthorne relied upon the integrity of Meadows. Undoubtedly. He believed implicitly in his honesty as a man, and also had unquestioning faith in his financial standing. This suggestion is fortified by the fact that just before Silverthorne left for Europe he authorized Meadows to sell 100 shares of the capital stock of the Columbia National Bank of Buffalo for the sum of $30,000, and told him he might retain the money as a loan. The stock was sold for $29,000, and the defendant used the money, all of which denotes the high regard in which Silverthorne held the defendant. The implicit trust and confidence placed in the defendant cannot extenuate its abuse by the latter. His conduct, in view of this faith in him, is the more to be condemned. The essence of the crime of larceny involving embezzlement is breach of confidence, and the present case apparently is no departure from the general trend of cases of this kind.

The learned counsel argue strenuously that there was no sufficient evidence of any criminal intent to defraud Silverthorne by the appropriation of the avails of the check. In the first place, it is contended

that the defendant acted openly, and not secretly, in depositing and paying out the money. It, of course, was distributed upon checks delivered in the usual way. Silverthorne did not know it was being used to pay the debts of Meadows, Williams & Co. or of the defendant. The bank depositary was not advised as to the purpose for which the brokers received the money. None of the payees of the checks by which it was distributed were cognizant of the transaction with Silverthorne. So far as Silverthorne, the only person entitled to know, was concerned, the disbursement of the money was secret.

. The counsel rely upon People ex rel. Perkins v. Moss, 187 N. Y. 410, 80 N. E. 383, 11 L. R. A. (N. S.) 528. In that case Perkins, under the direction of the president of an insurance company, contributed to the presidential campaign fund the sum of $50,000 upon the promise that he was to be reimbursed from the funds of the insurance company. It appeared that the president of the company had been in the habit of making such disbursements; that he conferred with the finance committee of the company and all the members agreed that Perkins should be reimbursed for the moneys advanced; and the president, in the execution of the authority with which he had in fact always been endowed, paid Perkins for the moneys advanced. The court held, while the payment of the money was illegal, there was no criminal intent disclosed and that the transaction was open, and Perkins honestly believed he was advancing the money properly as directed by the president, and no benefit inured to him. I find no parallel in the two cases.

In the present case, the defendant, as the jury have found, knew the money did not belong to him, and he was benefited by its appropriation. Criminal intent must be gathered from the facts connected with the chief transaction, and ordinarily a man intends what his acts indicate. The defendant must have realized he was in great financial stress at the time Silverthorne delivered the check to his firm. On that very day his partner, Williams, withdrew from the firm, and the only part of the assets which he received was $1 and certain securities of little, if any, value. And yet, if the avails of this check belonged to the firm, there were more than $70,000 in cash to be taken into account. In about three months, without any untoward or sudden catastrophe, the firm was found to be insolvent owing $600,000, and with assets of $85,000. The defendant swiftly paid out the avails of the check. Most of it had disappeared in three or four days, and the pressing obligations varied from bills for milk and flowers to large sums to right up the marginal stock account with Post & Flagg. The jury, therefore, had abundant evidence to authorize them to find that the defendant knew he was on the verge of bankruptcy when he appropriated the money of Silverthorne.

Again, the defendant knew that Silverthorne expected to start for Europe early in June, and would be absent for three months. The defendant might have expected that a favorable turn in his stock transactions would enable him to replace the money appropriated before Silverthorne returned. The agent or trustee generally takes this optimistic view of the outcome of his speculation when he converts the money entrusted to him. The offense of embezzlement is in the initial

act of misappropriation, and the fact that the defendant intended to restore or return the property embezzled is no defense where restoration has not been made. Section 549, Penal Code.

The intent to misappropriate the money may not have existed at the time the deposit was made to the credit of Meadows, Williams & Co. The firm may lawfully have held the money as trustee, bailee, or agent, although in their general account. When it was used and appropriated for their benefit and in violation of their fiduciary relation, the intentional misappropriation may first have been made and that constitutes the crime. People v. Civille, 44 Hun, 497, 500, supra. In People v. Thomas, 83 App. Div. 226, 82 N. Y. Supp. 215, relied upon by the appellant, the money which the complainant claimed was embezzled was paid over to the defendant to be used in stock speculations on marginal accounts. The money was not to be deposited in a special account as the money of the complainant. The court held that the money was not received in a fiduciary capacity, but by the defendant as a broker for general use in the purchase of stocks on margins as his judgment dictated. We think the verdict was justified by the evidence.

The defendant seeks for a reversal of the judgment for alleged errors committed on the trial, only one of which calls for independent discussion. The defendant had been sworn as a witness in the bankruptcy proceeding before the referee in bankruptcy, and, acting on the advice of his counsel, availed himself of the privilege to which he was entitled and declined to answer certain questions involving the transactions with Silverthorne on the ground they would tend to incriminate him. On the trial of this action he testified on his own behalf, detailing with particularity all the transactions upon which the charge of embezzlement was framed, and also testifying that he did not intend to defraud Silverthorne or deprive him of his property. Upon the cross-examination he was interrogated sharply upon the question of his intent, and among other things was examined in regard to the testimony in the bankruptcy proceeding already referred to. He was also asked what induced him to avail himself of his privilege in the bankruptcy proceeding, and answered that he was advised to do so by his counsel. There were two objects, I assume, in this line of cross-examination. In the first place, Silverthorne and the defendant disagreed in some material aspects, and the question of their credibility was an important one for the jury to consider. In the second place, the district attorney was endeavoring to break the force of the defendant's testimony that he did not intend to commit any crime when he accepted the check and used the avails. If he was protecting himself by his privilege in the bankruptcy proceeding, the claim might be made that such course was incompatible with the one taken on the trial that he did not intend to defraud Silverthorne. The defendant by testifying to his own intent opened the door to any cross-examination legitimately bearing upon that subject. People v. Hinksman, 192 N. Y. 421, 85 N. E. 676; People v. Webster, 139 N. Y. 73, 84, 34 N. E. 730; People v. Tice, 131 N. Y. 651, 656, et seq., 30 N. E. 494, 15 L. R. A. 669. The defendant was not obliged to testify. His omission to do so could not be commented upon. When, however, he elected to take

the stand in his own behalf, he was subject to cross-examination the same as any other witness. The extent to which disparaging questions are permitted is in the discretion of the trial court, and, unless the discretion is abused, his rulings are not reviewable on appeal. People v. Webster, 139 N. Y. 73, 84, 34 N. E. 730, supra. In reply to the questions put to him by the district attorney the defendant freely and fully stated the reasons which induced him to avail himself of his constitutional privilege in the insolvency proceeding, and, even if the questions were improper, when taken in connection with the explanations made, they are not of sufficient gravity to call for a reversal of the judgment.

We have examined the other questions discussed upon the brief of the appellant's attorneys, but do not deem it necessary to consider them separately, as in our judgment they were not errors, or, if so, not harmful or material.

The judgment and orders should be affirmed.

Judgment and orders affirmed. All concur, except KRUSE, J., who dissents.

KRUSE, J. (dissenting). I think the jury could well have found from the evidence that Meadows, the defendant, acted in good faith and without intent to defraud Silverthorne in using the check in question, and that Silverthorne himself did not expect that the identical check or the proceeds thereof would be transmitted to the New York correspondents to pay for the stock. Silverthorne was not inexperienced. He was a man of affairs, had dealt in stocks, and presumably familiar with the way in which the business of dealing in stocks is conducted. He knew that the stock had been bought by Meadows, Williams & Co.; that the purchase price or some part thereof had been paid, or at least that Meadows, Williams & Co. had obligated themselves personally therefor. He regarded the firm as perfectly responsible. A day or two after the check was given and used he asked Meadows to retain the proceeds of the sale of certain other stock and allow him the interest thereon. From the final transaction in transmitting the check and the other circumstances, the conclusion is permissible that the check was intended as payment to Meadows, Williams & Co., upon their personal agreement absolutely to sell and deliver the stock to Silverthorne, and not merely for transmission by Meadows, Williams & Co. to the New York brokers.

The Silverthorne check is dated May 22, 1908, and on the next day the check was indorsed by Meadows, Williams & Co. and delivered to the Bank of Buffalo, and the amount thereof credited by the bank to the firm. On the same day three other deposits were made and credited to the same account. The account was an active one, consisting of daily items of credit and debit, and continued so for some time. Checks were drawn against the account, among others, one for $28,000, the same day the Silverthorne check was used, payable to the order of Post & Flagg, through whom Meadows, Williams & Co. had purchased the stock intended for delivery to Silverthorne. The check was not applied upon that specific purchase, however, but

generally upon the account which Meadows, Williams & Co. had with Post & Flagg.

It is unnecessary to refer to the numerous checks which were drawn by Meadows, Williams & Co. upon the Bank of Buffalo after the delivery of the Silverthorne check and crediting the amount thereof, or to the different items of credit in their account with the bank.

The question of criminal intent as it was finally left to the jury was that it is only necessary that the intent to deprive or defraud Silverthorne existed at the time the money was checked out and used. I am unable to see how that could be so. The crime charged, if committed at all, was committed when the check was used, and not when the defendant drew the firm checks upon the general account. There was no specific money in the bank, represented by the Silverthorne check, which belonged either to Silverthorne or to Meadows, Williams & Co. Immediately upon using the check the relation between the bank and Meadows, Williams & Co. was that of debtor and creditor. But, even if the defendant can be convicted of the crime of embezzlement in drawing checks in the firm name upon the bank against the general credit balance created in part by the improper use of the Silverthorne check, that was not the charge contained in the indictment.

I do not say that the drawing of these checks by Meadows may not be a proper circumstance bearing upon the question as to whether the use of the Silverthorne check was fraudulent or not; but that is not the question.

The case of People v. Civille, 44 Hun, 497, relied upon to support the charge as made, is unlike this case, as it seems to me. There it appeared that the check representing the embezzled funds was deposited in a special account in the name of Civille, the defendant as trustee, and the amount was thereafter paid by the bank to him and misappropriated. The wrong there consisted in using the money which had been paid over to him by the bank upon this trust account, and that was the crime charged. Here the wrong charged was in using the check and having the amount thereof credited to the personal account of the firm. At all events, that was the only transaction proven which would be consistent with the charge contained in the indictment. If it was intended to charge the defendant with embezzlement in misappropriating the moneys represented by the firm checks drawn by him, that charge should have been made specifically in the indictment, and the particular transaction set forth, naming the amount, the time, and other details constituting the offense.

It does not seem to me that the conviction can be upheld upon any such theory. If so, upon which of the numerous checks does the conviction rest? It cannot be successfully claimed that Meadows had no right to draw any checks after the Silverthorne check had been used at the bank, since the firm had a credit balance there before the check was so deposited, and, as has been said, that is not the charge contained in the indictment. The offense set up in the indictment is the entire amount of the Silverthorne check charged as one act of embezzlement or larceny, as it is defined by the Penal Code.

I think the judgment of conviction should be reversed and a new trial ordered.