# SUPREME COURT — APPELLATE DIVISION — FIRST DEPARTMENT.

## February 1, 1918.

## THE PEOPLE v. ATTILIO DE SIMONE.

(181 App. Div. 840.)

TRIAL—MURDER—DISTINCTION BETWEEN SUBSTANTIAL AND HARMLESS ERROR.

The dividing line between substantial error which calls for a reversal of a judgment of conviction in a criminal action and such error as may be disregarded, depends in large measure upon the conviction in the minds of the reviewing judges of the defendant's guilt.

SAME—WHEN FAILURE TO OBSERVE LEGAL RULES WILL NOT VITIATE TRIAL.

If from the evidence in the criminal action the defendant's guilt clearly appears, a failure to strictly adhere to legal rules will not vitiate the crime.

SAME—WHEN EXCLUSION OF TESTIMONY HARMLESS.

While upon a trial for homicide a question to the very young son of the victim, who witnessed the murder, why he' had not told the police-man at the arrest of the defendant that he was the man who shot his father, was proper, yet in view of the natural fear in the minds of young children of the officers of the law, his failure to tell the policeman is so immaterial as to be negligible and the exclusion of the testimony is harmless.

SAME—WHEN DISTRICT ATTORNEY EXCEEDS RIGHTS IN OPENING TO JURY.

A district attorney exceeds his rights when in his opening he states matter as proof of a motive in defendant to commit the crime charged, which he cannot prove, cross-examines defendant on collateral issues to an undue extent, and on issues entirely irrelevant to the question of defendant's guilt of the crime for which he was on trial; but such acts are not prejudicial error calling for the reversal of a judgment of conviction, where the jury was instructed that no motive for the crime had been proved.

SAME—REMARK OF BYSTANDER AS PART OF RES GESTÆ.

Evidence of the remark of a bystander that he, meaning defendant,

"ran over Houston street" was admissible as part of the *res gestœ*, the crime and the immediate flight being necessarily linked together.

SHEARN and PAGE, JJ., dissented, with opinion.

APPEAL by the defendant, Attilio De Simone, from a judgment of the Court of General Sessions of the Peace in and for the county of New York, Part V, entered in the office of the clerk of said court on the 31st day of October, 1916, convicting the defendant of the crime of murder in the second degree.

*Frank Moss,* of counsel (*Isidor Wels* and *Caesar B. F. Barra,* with him on the brief), for the appellant.

*Robert C. Taylor,* of counsel (*Edward Swann, District Attorney*), for the respondent.

SMITH, J.:

On July 25, 1916, Alexander Della Rosa, a native of Italy, was deliberately murdered upon Thompson street, in the city of New York. This defendant has been charged by a grand jury with having committed the crime, and has been convicted by a trial jury. His trial was fairly conducted by the learned trial judge, and to his charge to the jury the defendant's counsel stated in open court that he took no exception. By the verdict of the jury he was found guilty of murder in the second degree, and he has appealed to this court for a new trial, alleging that his guilt was not proven and that he was not tried according to law.

His first challenge to the judgment is that the verdict is against the weight of the evidence. Upon careful review of the evidence, I am of opinion that the record contains abundant evidence to sustain the conviction. In the first place, he is charged with the commission of the crime by two eye-witnesses. One Menichino, sixty-five years of age, saw the defendant fire the fatal shots. One of the shots, without intention, hit this

witness.  He knew the man and identified him positively.  His
evidence is undoubtedly weakened to an extent by some ap-
parent contradictions and by testimony that upon the night
of the murder he was confronted by defendant in the presence
of two policemen, and then said that he did not know who fired
the shots.  But this conversation was through an interpreter
(not sworn) and when the man was dazed by his own wound,
and his apparent hesitancy in answering the questions then
asked indicate either that he did not understand or that he was
for some reason unwilling at that time to charge defendant.  At
the trial, however, he was positive in his charge, and the jury
might well have believed his evidence then given.  The son of
the deceased also swore that he saw defendant commit the mur-
der.  His testimony is also to an extent weakened by the fact
that his testimony differs in some particulars from some other
testimony in the case.  Whether these discrepancies arose from
the use of the interpreter or arose from a confused recollection
of the event, he swore positively at the trial to the defendant's
crime, and I am not prepared to say that the jury may not have
believed that in the main facts his evidence was wholly reliable.
I attribute no importance to the fact that he did not tell the
police that night that the defendant was the man who shot his
father.  He was a very young boy, laboring under intense
excitement, and might have been in fear of the officers of the
law or of the friends of the defendant in whose midst he found
himself, with his father, his protector, dead.  His story was
consistent both on direct and cross-examination, and the credi-
bility of that testimony was for the jury to judge.

Again, the defendant was immediately before the shooting
with his friend De Vito.  He came out of the restaurant with
him.  The murder was committed directly in front of the
restaurant.  He swears that he turned one way and his friend
the other.  Almost immediately the shooting took place.  De
Vito saw the whole affair.  He could have cleared his friend

if innocent. Why was he not called? The defendant's failure to call his friend, who could have cleared him if he had not fired the shots, was most suspicious, and the jury might have so considered it.

Again, the defendant's conduct when arrested proved his guilt. He ran from the scene. When arrested and asked why, he said, " I heard some shooting." " I am kind of nervous." " Wouldn't you run if you heard shots ? " " I did not want to be mixed up in it." Was this the conduct or excuse of an innocent man? But go a step further. When the second policeman came up and asked him why he shot the man he said, " I didn't shoot him; he is a friend of mine." So it now appears that he did not simply " hear some shooting." He had seen his friend murdered in cold blood before his eyes and had run away because " he did not want to be mixed up " in the matter. So much for his declarations. He swore upon the stand that although only a few feet from the place of the murder when he heard the first shot fired he did not look back, but immediately ran away, and did not know who was shot, and yet, according to two witnesses, the two policemen, he said, when asked why he shot him, that the murdered man " is a friend of mine." Notice, too, that this was to be his defense. When confronted by his dying victim at the drug store, he himself swears he said, " He is my friend." Is it to be wondered that the jury rejected his story?

Again, after the murder this defendant *at once* ran down Thompson street and up Houston street for about seventy-five feet, when he ran into the arms of Policeman Schachne. It is clearly evident that he alone was running from the scene of the murder. Policeman Schachne had no trouble in picking out the man who was in flight. He went directly for the defendant and halted him. He then led him back four or five feet, when Policeman Harson came up. Harson, who was following him, swears that he saw no one else running. When Harson came

up he at once went past the defendant about four feet and picked up a gun, which was still hot. All agree that this was the gun with which the murder was committed. It must have been brought from the scene of the murder by some one quickly who had run to that point. This defendant was the only man running. It was picked up at the exact place at which defendant was arrested. It matters not that the policemen did not see him drop it. They were not watching his hands particularly. He may have carried the gun in his hands, or more likely in his pocket, and when arrested knew well the danger of having the gun found on his person. I say he was the only man running. When a man is running away there are always those who hasten their steps to keep him in sight to see where he may go, and this was apparently the case here. But the man well in the lead was defendant, and so far in the lead that Harson saw no others running. The heated gun was apparently picked up at once, before another could have reached the spot and dropped it. The inference is irresistible. The relentless logic of this heated gun found at the exact spot where defendant was halted in his flight almost immediately thereafter is what has closed the prison doors upon this defendant, and appellate courts are commanded by law not to open those doors except for substantial error committed upon the trial.

The dividing line between substantial error which calls for the reversal of a conviction and such error as may be disregarded, depends largely upon the conviction in the minds of the reviewing judges of the defendant's guilt. If his guilt clearly appears, a failure to adhere strictly to legal rules will not vitiate a trial. It is the duty of courts to see that no innocent man shall suffer. No less imperative is the duty of courts to so enforce the law that it may prove a terror to evildoers, to the end that the lives of innocent citizens in the future may not be sacrificed.

What, then, are the errors claimed to be sufficient to reverse this judgment?

It is said that the court erred in not allowing the defendant's counsel to ask the boy Luigi why he had not told the policemen at the time of the arrest that the defendant was the man who had shot his father. This question was proper, but in view of the age of the boy, of his shock in just having witnessed his father's murder, of the natural fear in the minds of young children of the officers of the law, his failure to so state to the policemen becomes so immaterial as to be negligible.

It is said that the prosecuting attorney exceeded his rights by stating in his opening, matter as proof of a motive in defendant to commit the crime which he could not prove, and also in cross-examination of defendant on side issues to an undue extent and on some issues which were entirely irrelevant to the issue of defendant's guilt. As a criticism, the claim is good. It is most unfortunate for prosecuting officers to attempt to secure convictions by insisting upon procedure known by them to be irregular. Such a course should be restrained and rebuked by the trial court. As a ground of substantial error, however, the claim of appellant is not good. The object of the evidence was to show motive. The trial court instructed the jury that no motive for the crime had been proven, and in view of this charge, I think the acts of the prosecuting attorney were not so prejudicial as to justify a reversal of the judgment.

Again, it is claimed that substantial error was committed by the admission of evidence of the remark of a bystander that " He ran over Houston street." The policeman was after a man who was running away. That man was identified by that remark, and not the man who committed the murder. But the evidence was admissible as part of the *res gestæ*. The crime and the immediate flight are necessarily linked together. The excitement attending a murder and the escape of the murderer are so intense that the remark was spontaneous or impulsive and unreflecting. It was done before there was time to contrive or misrepresent. It related to a part of the principal act. Again,

the defendant swears that he and many others were running both ways; that some were running ahead and some behind him. If so, the remark could not have served as any identification of defendant. If, on the other hand, as is undoubtedly true, the defendant was the only man who was in fact running away, then he was the man who carried the heated revolver to the spot where he was arrested and where it was found, and his guilt is certain, and the jury was indeed lenient that it did not exact his life as well as his liberty.

The judgment should be affirmed.

CLARKE, P. J., and SCOTT, J., concurred; PAGE and SHEARN, JJ., dissented.

SHEARN, J. (dissenting):

The appellant was convicted of murder in the second degree. The homicide occurred on July 25, 1916, at about 7:15 P. M. in front of a coffee house on the west side of Thompson street, No. 169, eighty feet north of the curb of West Houston street, which crosses Thompson street at right angles and runs generally east and west. Sullivan street runs parallel with Thompson street and is a short block to the west. Police Officer Harson, patroling the east side of Thompson street, about seventy-five feet south of West Houston street, heard several shots, ran north and, as the shots appeared to come from the west side of the street, crossed Thompson street diagonally on the run. In crossing the street there was a wagon going north on Thompson street which blocked his view. Harson crossed behind the wagon and came out on the west side of Thompson street about ten feet north of the northwest corner of West Houston and Thompson streets. At that point, as the sidewalk is seventeen feet wide from the curb to the corner grocery, Harson had a view up Thompson street and west on West Houston street. Someone in the crowd called out, " He ran

over Houston street." Harson immediately turned, looked west on West Houston street and saw the defendant about thirty feet ahead of him, running in the street. Harson started in pursuit and when he had run about twenty-five or thirty feet further, Officer Schachne, who was coming east on West Houston street, from the corner of Sullivan street, stopped the defendant. Harson ran up to them, but before reaching them Officer Schachne had turned the defendant around and started walking him back toward Thompson street. Meeting them, Harson asked the defendant what he was running for and the defendant replied: " Wouldn't you run if you heard shots ? " Harson then looked down on the ground, and about four feet in the rear of the defendant, that is, towards Sullivan street, saw something lying in the street. He picked it up and found that it was an automatic revolver containing only one cartridge. The revolver was hot, and there is no question but that it was the one used by the murderer. Officer Schachne testified that he was standing on the southeast corner of West Houston and Sullivan streets when he heard several shots that appeared to come from the direction of Thompson street; that he went in that direction towards a number of people and when he was half way down the block saw one man coming west, a man dressed in a grey suit, who was the defendant; that he stopped the defendant and asked him, " What are you running about ? " and defendant replied: " I heard some shooting, I am kind of nervous, * * * and when there is any shooting around I don't want to be mixed up in it; " that he turned defendant around and walked him east about three or four or perhaps five feet when Officer Harson came running up and asked the defendant, " What are you running about ? " that the defendant replied, " I heard some shooting; " that Harson asked, " What did you shoot that man for ? " and defendant replied, " I didn't shoot him, he is a friend of mine; " that Harson then went west about three or four feet, bent down and picked up something and said, " I got the gun.

It is still hot." The officers then took the defendant to the drug store on the northeast corner of Thompson and West Houston streets, where they found the murdered man, Della Rosa, stretched out on the floor. They took the defendant over to where Della Rosa lay to have him identified, but Della Rosa said nothing, being in a dying condition. While the officers were in the drug store with the defendant an old man named Menichino, a pushcart peddler, who had been struck in the arm by one of the bullets, was brought in, and, on being confronted with the defendant, failed to identify him. It appeared from the testimony of the officers that at the time the defendant was stopped and placed under arrest there were a number of other persons on West Houston street in the immediate vicinity. The murdered man was an intimate friend of the defendant, and no motive for the murder was shown. Clearly, if the defendant's guilt rested upon the evidence thus far referred to, the People's case would have been very weak, for it would have rested upon the two circumstances of flight and the finding of the hot revolver on the ground in the immediate vicinity of the defendant when arrested. Flight standing alone raises no legal presumption of guilt. It has no probative force unless there are facts pointing to the motive which prompted it. It is a circumstance to be considered and weighed in connection with other proof and with that care and circumspection which its inconclusiveness, when standing alone, requires. (Hickory v. United States, 160 U. S. 408, 417.) Of course, the pistol might have been dropped by someone of the numerous other persons who were in West Houston street at the time, and it is a significant fact that although the defendant while running west was within the clear view of Officer Schachne, who saw his arms moving back and forth as defendant ran, the officer did not see the defendant drop the pistol; neither did he hear it fall to the pavement, although it must have dropped within a foot or two of the officer if it was dropped by the defendant.

Further, Officer Harson, who had the defendant in view as the defendant ran from the point thirty feet west of the corner to the place where he was stopped, did not see the defendant drop the pistol.

The People, however, did not rest with this proof, but produced two alleged eye-witnesses of the shooting. One was Luigi Della Rosa, the thirteen-year-old son of the murdered man. The boy testified that he saw his father in front of the coffee cafe talking with the old man Menichino when the defendant and one Genaro Aveto came out of the coffee house with two other men; that Aveto went back into the coffee house, and, while standing in the doorway, made a sign to the defendant by winking his eye; and that thereupon the defendant drew his revolver and fired at Della Rosa, who fell at the first shot; that the defendant fired five or six times more when Della Rosa was lying on the sidewalk and then ran to the corner of West Houston street and up West Houston street toward Sullivan street; that the boy followed defendant and saw Officer Schachne catch him; that when the officer caught the defendant the latter " threw the gun away; " that when the defendant dropped the revolver he had it back of him with both hands on it; that it made a noise when it dropped and that he saw Officer Harson pick it up. The boy testified that he walked back with the officers when they took the defendant to the drug store, but that he was not allowed at that time to enter the drug store. A few minutes later, after it was disclosed that he was the son of the man who had been shot, he was admitted, he says, to the drug store; and that the defendant was there and his father was lying on the floor. He said that Menichino was sitting in a chair. On cross-examination the boy testified that when his father fell in the street he ran to help him get up and stopped there for about three minutes and then ran after the defendant. He said that although he was within ten feet of the spot where the defendant was arrested, and although he walked back to the drug

store in the company of the officers and the defendant, he did not tell either of the officers that the defendant was the man who had shot his father. Both of the officers testified that they did not see the boy in West Houston street. The boy also admitted that when in the drug store in the presence of the defendant and while his father was lying bleeding on the floor he did not say to any one that the defendant was the one who had shot his father. He did not tell any one that he saw the defendant shoot his father or drop the revolver until he went to his uncle's house on the night of the murder after his father had been removed to the hospital.

Wholly disregarding the testimony of the defendant's witnesses that the boy was not in West Houston street at the time of the arrest, but came up afterwards and inquired who had shot his father, and overlooking the contradiction between the boy's testimony as to defendant's running with both hands behind him and Officer Schachne's testimony that defendant was pumping his arms as he ran, it is quite incredible that, if the boy had actually seen the defendant shoot his father, he would have failed to tell the officers so when he saw them make the arrest and, particularly, that he would have failed to do so when the defendant confronted the boy's father who was lying bleeding on the drug store floor.

The People further called the old man Menichino, who testified that while he was walking in the middle of Thompson street he felt something strike his arm and turned around and saw the defendant with a pistol in his hand shooting and then saw the defendant run to the corner of West Houston street and up toward Sullivan street. As already noted, Menichino, when questioned by the police officers in the drug store through an interpreter, immediately after the shooting, failed to identify the defendant.

Of course the credibility of these two alleged eye-witnesses was for the jury, but, it seems quite plain, the case for the

People, as above outlined, was not very strong. The defendant took the stand in his own behalf and denied any connection with the shooting, and the only manner in which the People's case was strengthened by the defense was the defendant's resort in some instances to what appears to be falsehood and evasion.

The case has been thus outlined in substance, so far as the prosecution is concerned, not with the notion that it is the function of an appellate court to substitute its judgment upon the probabilities of the case and the credibility of the witnesses for that of the jury, but because of the nature of the errors assigned by the defendant in his appeal. As was said by WERNER, J., in People v. Hinksman (192 N. Y. 421, 428, 22 N. Y. Crim. 585): "Thus the most conspicuous fact in the case is that the evidence against the defendant, taken as a whole, was not strong, and yet we cannot say that it was so weak as not to support the verdict of the jury. We emphasize that circumstance because material and substantial errors in rulings can never be overlooked in cases where, as in the case at bar, the chain of evidence may be technically unbroken, and yet be so weak as to yield to the attack of very slight opposing facts or circumstances. Errors committed in such cases may in themselves be sufficeint to balance the scales against a defendant, although they might prove absolutely harmless in cases where the proof is so clear and cogent as to dispel all doubt."

It is earnestly contended on behalf of the appellant that he did not have a fair trial. In support of this, the appellant assigns as error the extent to which the assistant district attorney was permitted to go in cross-examination of the defendant, which, coupled with an opening and damaging statement of motive, as to which there was an utter failure of proof, suggestive questions carrying harmful inferences which were not and could not be established as facts, and a persistent effort to convict the defendant out of his own mouth of a shameful offense in no manner related to the crime charged, was inevitably cal-

culated to create an atmosphere unfavorable to the defendant and to render it easier for the jury to find the defendant guilty.

In opening the case to the jury the assistant district attorney, said: " It seems that De Simone, for about eight years prior to that time, had been living with a woman named Rosa Vitosa, Rosa having come to him when she was about fifteen years old." Here the defendant's counsel objected with, " The relations of the defendant with this woman, not his wife, some years ago," were incompetent and improper. The court, in overruling the objection, said: " I think it may be shown as bearing on any possible question of motive." The assistant district attorney continued with his narrative, and a little further on said: " It seems that through some information which the dead man, Della Rosa, obtained he went to the defendant De Simone with the statement that Rosa, his common-law wife, was untrue to him, that Rosa had gone with this De Vito, owner of the cafe, to a place in 27th street, where she had been known, and where she had had illicit relations with De Vito.

" Rosa, by the way, so far as we can discover, is not only the common-law wife, but is also the *breadwinner of the family.*"

Defendant's counsel interposed an objection that the statement was highly improper and that the prosecutor knew that he could not offer such evidence as part of the case in chief. The prosecutor responded, " That is part of the motive, it seems to me," and the court said: " I see no objection to that. The district attorney expects to prove that as part of the case." Defendant's counsel then moved for the withdrawal of a juror and the declaration of a mistrial and took an exception to the denial of the motion. No proof whatever was offered as a part of the prosecution's case in chief to establish this alleged or any other motive, although some attempt was made to do so on cross-examination of the defendant. At no stage of the case was there any proof that the defendant was living on the proceeds of this woman's prostitution, which was the plain import of the

statement to the jury. Throughout the cross-examination of the defendant a persistent effort was made to keep alive in the minds of the jury this damaging accusation by means of suggestive questions. For example: " Q. Isn't it a fact Rosy is a prostitute? A. She is not, not that I know of. * * * Q. Don't you know that she has been convicted for prostitution? * * * A. I do not." (No attempt was at any time made to prove a conviction.)

The prosecutor continued his cross-examination as follows: " Q. You are living with a woman named Rosy, aren't you? A. Yes. Mr. Barra: Your Honor, he has answered that. Q. What is Rosy's business? A. No business at all. Q. Isn't it a fact you knew she is a prostitute? A. Not that I know of, no, sir. Q. Don't you know that she is a common prostitute upon the streets? A. No, I do not. Q. Doesn't she give you the proceeds of her prostitution? A. She never did. Q. You do not know whether she is a prostitute? A. I do not. Q. You know she has been living with you for eight years without being married to you? A. She was married once. Mr. Barra: That is over my objection. [The Assistant District Attorney]: I ask that counsel should not interrupt. * * * The Court: Objection overruled. Mr. Barra: Exception. * * * Q. Rosy was at one time in a house of prostitution in Twenty-seventh street, wasn't she, about five years ago? Mr. Barra: I object to that as incompetent, irrelevant and immaterial. The Court: Objection overruled. Mr. Barra: Exception. A. No, sir, she was not. Q. Isn't it a fact that within a very short time of the day of the shooting that De Vito had taken her to Twenty-seventh street to a house of prostitution? Mr. Barra: He has answered that and I object to it as repetition, and on the further ground it is incompetent, irrelevant and immaterial. The Court: Objection overruled. Mr. Barra: Exception. A. No, sir, she never goes with anybody. Q. Didn't she go to a house of prostitution on Twenty-seventh street? A. She never

did." All of this was over the reiterated objection and exception of the defendant's counsel.

It was of course entirely proper to emphasize the fact, freely admitted by defendant as a part of his direct examination, that he was living with a woman to whom he was not married, but that was vastly different from the charge that the defendant was living with a prostitute, and the infinitely viler charge that he was living on the wages of prostitution. Without a shred of evidence to support either accusation, and knowing that unless the defendant admitted the charge no proof in support of it could be offered on the defendant's trial for murder, the prosecutor not only injected this unwarranted and damaging accusation into his opening, but returned to it again and again, suggesting it in so many ways and so persistently that the jury might well have wondered which charge he was being tried for. It was extremely improper to plant the poisonous seed of this infamous charge in the minds of the jury in an opening statement, but if that had been the end of the matter it might possibly be assumed that an intelligent jury would disregard the statement. When, however, it was persisted in throughout the case by a responsible public official, and being of such an extremely damaging nature, it cannot be safely assumed in a case where the evidence of defendant's guilt is of the character previously outlined, that the jury disregarded the accusation and the suggestive questions as mere evidence of excessive zeal on the part of the prosecutor. The trial under such circumstances cannot be said to be fair. Important as is the swift and sure conviction of criminals, of transcending importance is it that every accused person should be afforded a genuinely fair trial. As the Court of Appeals said in People v. Wolf (183 N. Y. 464, 19 N. Y. Crim. 460): " Why should court and counsel violate the law in order to enforce it? What a pernicious example is presented when such officers, intrusted with the most important duties, in attempting to punish the guilty,

are themselves guilty of departing from the law.   Charity cannot extend its presumption to shield either in this case without also presuming that both were ignorant of the law.   It may be that this warning will be disregarded as others have been, but it will be well for district attorneys and trial judges to remember that errors, such as are now complained of, if raised, as they were in this case, by sufficient objections and exceptions, will, upon appeal to this court, result in the reversal of the judgment of conviction.   In no other way can the command of the law be observed and the rights of innocent persons charged with crime be adequately protected.   It is not to shield the guilty but to protect the innocent, that courts are steadfast in upholding rules, in force for generations, by which it may be lawfully determined who are guilty."

Again, as said very recently by the Court of Appeals in People v. Richardson (222 N. Y. 103), dealing with an improper impeaching cross-examination of a witness for a defendant in a criminal trial, holding the evidence inadmissible and reversing the judgment of conviction: " The reasons for the established rules, which I have stated, forbid the rule urged upon us by the argument of the district attorney.   Those reasons are that the evidence which they bar would have a tendency to withdraw and mislead the attention of the jury from the real issue under inquiry and would subject the accused to charges unconnected with that issue and against which he had no reason to prepare.   (People v. Thompson, 212 N. Y. 249, 31 N. Y. Crim. 520.)   In People v. Sharp (107 N. Y. 427, 461, 5 N. Y. Crim. 569) Judge DANFORTH said: ' Such evidence is uniformly condemned as tending to draw away the minds of the jurors from the real point on which their verdict is sought and to excite prejudice and mislead them.' "   The accusation and the repeated suggestion that the defendant was living on the proceeds of prostitution certainly had a " tendency to withdraw and mislead the attention of the jury from the real issue under

inquiry " and " subject the accused to charges unconnected with that issue and against which he had no reason to prepare." (See, also, People v. Saitta, 170 App. Div. 665; People v. Freeman, 203 N. Y. 267; People v. Fielding, 158 id. 542.)

The defendant's complaint of the over-zealous conduct of the prosecutor is well founded, and, in the interest of justice, requires a new trial.

Furthermore, the court erred in admitting hearsay evidence.

Over the objection of the defendant, Officer Harson was permitted to testify that when he reached the northwest corner of West Houston and Thompson streets, as he ran to the scene of the shooting, " Somebody in the crowd hollered ' He ran over Houston street.' I immediately turned and looked over Houston street, and I saw the defendant about thirty feet ahead of me running." This remark of a hystander was received upon the theory that it was a part of the *res gestœ*. The district attorney seeks to justify the ruling upon the ground that the bystander's statement was receivable as an introductory matter, which explained why Harson acted as he did (citing People v. Taylor, 3 N. Y. Crim. 297, 299; affd., 101 N. Y. 608). The difficulty with this contention is that while the remark might have served such a purpose, it was fairly susceptible of an entirely different significance, fraught with very serious consequences to the defendant, namely, the identification of the defendant as the man who did the shooting. The obvious purpose of the remark was to direct the attention of the officer to the whereabouts of some person whom the officer was seeking. The remark followed so closely upon the shooting that, coming from one in the immediate vicinity of the crime, the plain inference is that the bystander understood that the person whom the officer was seeking was the man who had fired the shots. Under the circumstances, when the bystander said to the policeman, " He ran over Houston street," the statement was equivalent to saying, " The murderer ran over Houston street." At

any rate, the statement is fairly susceptible of that meaning, and might have been so interpreted, and, as it seems to me, would have been so interpreted by the jury. Therefore, the admissibility of the statement must be determined as though the bystander had in effect said, " The murderer ran over Houston street." There are numerous cases in other jurisdictions dealing with the admissibility of declarations of third persons identifying the defendant as the person who committed the crime, but no case closely in point is found in this State. The cases are collated by Wigmore in his work on Evidence (Vol. 3, § 1755, n. 1, 2), by Chamberlayne in his work on the Modern Law of Evidence (Vol. 4, § 2597) and in Bishop's New Criminal Procedure ([2d ed.], Vol. 2, §§ 1085, 1087). In the cases where the matter has been carefully considered and the evidence received it will be found that the declaration was either made within the hearing of the defendant or by actual participants in the acts constituting the *res gestæ*. Such would apparently be the rule in this State, if the sole test to be applied is that of *res gestæ*, for it was held in Butler v. Manhattan Railway Co. (143 N. Y. 417) that to make what was said by a third person competent evidence as part of the *res gestæ*, proximity in time with the act alone is insufficient; to make it competent what was said must be part of the principal fact, and so part of the act itself; that is, naturally accompanying the act, or calculated to unfold its character and quality. Under this test, the declaration of a bystander identifying the defendant as the person who committed the crime is not within the exceptions against hearsay testimony. In my opinion, however, the last word is not said on the question of the admissibility of such evidence when it is decided that the declarations are not part of the *res gestæ*, for as Professor Wigmore says: " There has been such a confounding of ideas, and such a profuse and indiscriminate use of the shibboleth ' *res gestæ*,' that it is perhaps impossible to disentangle the real basis of principle in-

volved." (Id., § 1745.) Approaching the question from the point of view of inquiring whether the evidence falls within any well-recognized exception to the rule against hearsay testimony, we find, as Professor Wigmore says (section 1749), this principle running through all the exceptions, namely, " that the statement must have been made under circumstances calculated to give special trustworthiness to it." In this class are included utterances which may be characterized as " spontaneous," " natural," " impulsive," and " instinctive." As to the admissibility of such evidence, there are certain limitations. The nature of the occasion must be such as to cause " *shock, startling enough* to produce this nervous excitement and render the utterance spontaneous and unreflecting. * * * The utterance must have been *before there has been time to contrive 'and misrepresent.* * * * The utterance must *relate to the circumstances of the occurrence preceding it."* (Wigm. Ev., § 1750.) The remark of the bystander in the case at bar does not come within the exception, from this point of view. It was neither spontaneous nor made under circumstances calculated to give some special trustworthiness to it. Giving the defendant the benefit of the presumption of innocence, to which he was entitled when the ruling was made, it was an entirely possible inference that the remark was made by the person who actually did the shooting and was intended to fasten suspicion upon the defendant, start the police officer in pursuit of the wrong person and enable the guilty person to effect his escape unnoticed. The circumstances do not give the declaration the badge of truth which is the prime requisite to allowing the exception to the rule against hearsay. In such a case as this, where the identity of the person who fired the shots is the vital matter in controversy, and where the character of the case against the defendant is such as indicated in the foregoing résumé of the evidence, it was harmful and reversible error to receive in evidence a decla-

ration of a bystander to the effect, in substance, that the defendant was the one who did the shooting.

The judgment of conviction should be reversed and a new trial ordered.

PAGE, J., concurred.

Judgment affirmed.